STATE of Oklahoma Ex rel., OKLA-HOMA BAR ASSOCIATION, Complainant,

v.

James PEARSON, Respondent.

No. SCBD 3486.

Supreme Court of Oklahoma.

Jan. 10, 1989.

Gloria Miller White, Asst. Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for complainant.

Catherine Holland Peterson, Lauren Day, Norman, for respondent.

SUMMERS, Justice.

A Complaint was filed by the Oklahoma Bar Association alleging that the respondent's conduct violated DR 6–101(A)(2) and (3); and DR 7–101(A)(1), (2), and (3) of the Code of Professional Responsibility. The OBA subsequently dismissed its Complaint insofar as it pertained to DR 6–101(A)(2). A hearing was held before a trial panel of the Professional Responsibility Tribunal (PRT). The Trial Panel made the following recommendation:[1]

> "It is the unanimous recommendation of the Trial Panel that the Complaint of the State of Oklahoma, ex rel., Oklahoma Bar Association against James Pearson be dismissed."

This Court conducts an independent review of the evidence submitted to a trial panel of the PRT. *State ex rel., Oklahoma Bar Association v. Perkins,* 757 P.2d 825, 828 (Okl.1988). Findings of fact and conclusions of law made by the PRT are not binding on this court nor do they carry a presumption of correctness. *State ex rel. Oklahoma Bar Association v. Braswell,* 663 P.2d 1228, 1230 (Okl.1983). We find that the allegations of violations of the Code of Professional Responsibility are not supported by the evidence presented.

## I. THE PROCEEDINGS BEFORE THE TRIAL PANEL

In June of 1985 Pearson agreed to represent Lawrence Williams for the filing of a writ of habeas corpus in federal court attacking Williams' conviction in CRF–74–3158 by reason of which Williams was serving time in prison. Pearson received a fee of $7,000 in July of 1985 to represent Williams in a habeas corpus proceeding in the United States District Court and any subsequent appeal to the United States Court of Appeals for the Tenth Circuit. The fee was paid by Williams' mother and aunt. In June of 1985 Pearson had said in a letter to Williams' mother that in trying to succeed with a writ of habeas corpus "we are facing an uphill task", and that the prior proceedings attacking the conviction "made a hard situation even more difficult." Williams had previously unsuccessfully litigated a direct appeal of his conviction, state post-conviction proceedings, and a writ of habeas corpus in federal court. Pearson indicated to Williams that he was concerned with three problems.

The first problem was filing a successive federal petition for writ of habeas corpus. See, Rules Governing Section 2254 Cases in the United States District Courts, Rule 9(b).[2] The second was meeting his burden of showing a need for an evidentiary hear-

---

1. One member of the three member trial panel did not participate in the second day of the respondent's hearing or in the subsequent recommendation of the panel.

2. Rule 9(b) provides: "A second or successive petition may be dismissed if the judge finds that

it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ."

ing. See, 28 U.S.C. § 2254(d). The third was the likelihood of the federal court's declining to review Williams' claims because they had been procedurally barred from review in the state courts. See, *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984).

Williams knew of these problems Pearson was concerned with and pointed out the case of *Reed v. Ross*, supra, in a letter to Pearson in December of 1985. Williams' testimony before the trial panel is contradictory. Williams testified that he did not discuss the problems with Pearson prior to July of 1986. (Tr. at 76–77). However, he also testified to the following.

"[T]he first phone call that I had with Mr. Pearson was before I gave him the money.... The first thing I wanted to know was how he was going to deal with the waiver[3] document." (Tr. at 75).

Pearson received his fee by two checks written in July of 1985. Thus, Williams testified that he discussed with Pearson, by at least July 1985, the problem of the claims being procedurally barred. Williams also testified that between December 1985 and May of 1986 he was in "constant communication" with Pearson and during this period he was "aware at the outset of the problems of waiver and the problem of needing an evidentiary hearing ... [and] that the prior habeas corpus created problems...." (Tr. at 74–75). On cross-examination of Williams by Pearson's counsel in the Bar proceeding the following was stated.

"Q. And you were aware of the problems prior to the time Mr. Pearson began his representation to you, weren't you?

A. That's why I paid him $7,000.

Q. You were aware of the problems, weren't you?

A. Right."

Williams knew that Pearson was researching the issues and preparing a petition for writ of habeas corpus with supporting brief. Williams stated the following in a letter to Pearson in July 1986.

"I am fully aware of all the opposition that you are face with in regard to representing me with my appeal. I further realize that by me forcing you to proceed at a hasty rate of speed will not benefit my situation none. So take your time and do me the best job that you possibly can." (Mistakes in original).

On or about February 22, 1987, Pearson visited Williams in prison. Williams described the visit as follows.

"Well, he brought with him a rough draft of the brief. We sat down and we talked about the different issues that he wanted to present. He was explaining to me how he felt the best way to go about doing it. He said that he felt that I had a good chance if we could get the court you know to hear it. And in the event that the court would hear the case, that I had a good chance to get an evidentiary hearing. If I got an evidentiary hearing, most likely I would get a new trial. And we discussed the—I guess you say the strongest issues and the weaker ones. I have done forgotten what issue he said that he thought was the best. I think it had something to do with the district attorney withholding evidence or something like that. I can't be sure. And we went over the whole thing. It took about an hour or so and he told me that, he told me to take it and study it and if I liked it, to let him know and he would file." (Tr. at 40–41).

Williams retained a copy of the rough draft and subsequently called Pearson and informed him that he liked the brief and wanted him to file it with the court. In March of 1987 Williams was still communicating with Pearson and offering suggestions for the strategy of the habeas corpus proceeding. In a letter by Williams written in March of 1987 he discusses the possibility of lawyer witnesses for his claims based on ineffective assistance of trial and appellate counsel. In this letter Williams re-

---

**3.** A petitioner for a writ of habeas corpus in federal court may have waived review of his federal claims when those same claims were barred from review in the petitioner's State court proceedings due to the failure to comply with a state procedural rule. See, *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

quested that Pearson find an attorney experienced in working with the Pardon and Parole Board. Both Williams and Pearson testified that the possibility of pursuing a parole was discussed in conversations spanning 1985–1987.

In April of 1987 Williams requested that Pearson drop the court action and refund a portion of the legal fee to pay for an attorney to represent him before the Pardon and Parole Board. Williams first requested that $5,000 be returned and Pearson declined. Williams later asked that $2,500 be returned. In August of 1987 (after a grievance had been filed by Williams' mother) Pearson refunded $2,500, delivered to Williams' mother a final original draft of the habeas corpus petition and brief for filing, and returned Williams' copies of court records.

Williams' mother testified that she was not satisfied with a refund of only $2,500. She testified that she discussed with her son the substance of the April letter and she did not approve of stopping the court action, stating: "I had already paid him [Pearson] and I wanted him to go ahead on this." However, she also testified that she could not remember if her son consulted with her prior to the April letter. She also testified that she thought that Pearson did not keep her well informed as to the progress of his work on the case.

Pearson testified that he spent 35–50 hours representing Williams in his efforts to draft a petition for writ of habeas corpus with supporting brief. He testified that he worked on the case a few hours at a time between 1985–1987. He testified that he started with a brief prepared by a different lawyer for one of Williams' state post-conviction proceedings. He then researched the cases in the prepared brief and made revisions in that brief for a federal habeas corpus proceeding. He also testified that he performed 8–10 hours of original research. He defined "original research" as not including the cases in the post-conviction brief and cases found shepardizing those cases.

Williams testified that he was in constant communication with Pearson. The record indicates that Pearson and Williams sent letters to each other and Williams stated that he "would always call to see what was going on" and that he talked with Pearson "every three weeks." The relationship between Williams and Pearson is described in testimony by Pearson.

"Our phone calls almost habitually followed the same pattern. Number one, I would tell Lawrence that I had been to the library and I could not find a way to recast the arguments. Then we would talk about parole. He had a closed mind on parole through the end of '86, at least to me, he did. Then we would talk about, then we would commiserate together about why it isn't going to work. And then he would say, 'Well, I understand these problems. I just hope you keep working.' I said, 'Well, Lawrence, I'm going to keep working for you.' Then I would go back to the library and read more habeas until it was coming out of my ears. Then he'd call me in another month and we'd have the same conversation." (Tr. at 177–178).

Williams was aware that Pearson was spending time researching the problems his case presented. Pearson summarized his method of accomplishing the necessary research in the following testimony.

"And the way I did research on this particular case is since at that time I was a solo practitioner, I didn't have a large library certainly not to do federal habeas work. So when I had research projects gather up, I would go to the OCU Law Library about once a month and I would always take that one along with all the others and spend the vast majority of the time. So I would spend two or three hours every time I would go down there. Sometimes it would be every two weeks, sometimes it would be a month. And that went along as I crafted my arguments and got them ready, I saw that, at that point I began to see the major problem is not the law. It is getting around the attorney general's response on waiver and already [the issues having] been resolved and no record to support." (Tr. at 141–142). (Explanation added).

## II. ALLEGATIONS OF PROFESSIONAL MISCONDUCT

The Bar Association maintains that Pearson violated the following disciplinary rules:

### DR 6–101(A)(3).

"(A) A lawyer shall not:

(3) Neglect a legal matter entrusted to him." 5 O.S. 1981, Ch. 1, App. 3, DR 6–101(A)(3).

### DR 7–101(A)(1), (2), and (3).

"(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests by opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B)." 5 O.S. 1981, Ch. 1, App. 3, DR 7–101(A)(1), (2), and (3).

We will examine the alleged rule violations in reverse order.

### A. DR 7–101(A)(3).

The Bar Association alleged that Pearson's actions prejudiced and damaged Williams and that such conduct violated DR 7–101(A)(3). Pearson asserted that no statute of limitations exists for federal habeas corpus and that his client was not injured by the 2 years he worked on the case. Delay in filing a petition for writ of habeas corpus may, in some cases, be crucial for judicial review of the petitioner's claims.

■ Delay in filing a federal petition for writ of habeas corpus may result in the dismissal of the petition. Rule 9(a), Rules Governing § 2254 Cases.[4] See also, *Vasquez v. Hillery*, 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986). Several federal circuit courts have utilized Rule 9 in dismissing petitions for writs of habeas corpus. *Strahan v. Blackburn*, 750 F.2d 438, 441–442 n. 4 (5th Cir.1985), *cert. denied*, 471 U.S. 1138, 105 S.Ct. 2683, 86 L.Ed.2d 700 (1985). The federal circuit that Williams' petition was to be filed in has utilized Rule 9(a) to dismiss a petition for writ of habeas corpus. *Bowen v. Murphy*, 698 F.2d 381 (10th Cir.1983). Cf. *Hannon v. Maschner*, 845 F.2d 1553 (10th Cir.1988), (application of *Bowen v. Murphy*, supra, required reversing a district court's Rule 9 dismissal of a petition). Delay in filing a petition for writ of habeas corpus has also been used to determine that a petitioner's claim was not credible. *Camillo v. Wyrick*, 640 F.2d 931, 935 (8th Cir. 1981), (a delay of five years indicated that the petitioner did not believe that his plea was coerced at the time it was entered). Thus, delay in the filing a petition may provide the State with a defense against the petition.

■ No evidence was introduced before the trial panel that the two years taken to produce the petition would, or possibly could, result in the State successfully raising a Rule 9 defense. No mention of Rule 9 appears in the Trial Panel record. Thus, no evidence was produced to the Trial Panel that the mere passage of time caused Williams any prejudice in pursuing a writ

4. Rule 9(a) provides: "A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred."

of habeas corpus. Williams testified that he could still file a petition for writ of habeas corpus using the petition and brief prepared for him by Pearson. The alleged violation of DR 7–101(A)(3) is not supported by the evidence. ·

### B. DR 7–101(A)(2) and (1).

The Bar Association alleges that Pearson failed to carry out his contract of employment with Williams and that by reason of such conduct he violated DR 7–101(A)(2). Williams testified that Pearson was retained with the understanding that the petition would be filed in September of 1985. (Tr. at 26). Pearson sent a letter on January 16, 1986, to Williams and his mother stating that the writ would be forwarded for their review by February 7, 1986. However, a draft of the petition was not given to Williams until February of 1987. The Bar Association also alleged that Pearson failed to seek the lawful objectives of his client in violation of DR 7–101(A)(1).

Pearson asserted that his client knew of his problems in drafting the documents and agreed that he should continue researching. Pearson also asserted that his contract of employment was terminated by Williams and this relieved him of his duty to represent him.

The essence of the alleged violations of DR 7–101(A)(2) and DR 7–101(A)(1) is that Pearson failed to carry out his contract of employment by taking 2 years to prepare the petition and brief and then failed to file them and start the proceeding. The plain language of DR 7–101(A) requires intentional conduct on the part of the lawyer. In *State ex rel. Oklahoma Bar Association v. Braswell,* 663 P.2d 1228 (Okl.1983), the court indicated that gross negligence is the "legal equivalent of intentional misconduct under Canon 7." *Id.,* 663 P.2d at 1232. In that case the lawyer did not adequately monitor a case and he failed to file a petition prior to the action becoming barred by the statute of limitations. The lawyer had been retained in October 1979 but did not file the petition until February 1982, after the client's complaint to the Bar Association. In that case we stated that

"[w]e cannot say that the care was merely slight and that no more than slight diligence was exercised." *Id.,* 663 P.2d at 1232.

Pearson worked on the case over a span of 2 years and eventually provided a petition and brief for Williams to file in federal court. No statute of limitations ran. We cannot say that Pearson's care was merely slight. We find significant the fact that Williams knew the care his case was receiving and expressed his desire that Pearson continue researching. The evidence presented does not support a violation of DR 7–101(A)(1) or (2).

### C. DR 6–101(A)(3).

The Bar Association alleges that Pearson neglected a legal matter entrusted to him and that such conduct violated DR 6–101(A)(3). Pearson maintained that Williams knew of Pearson's actions and aquiesced in them. The disturbing fact remains that Pearson was retained to file a petition for writ of habeas corpus in July of 1985 and in March of 1987 no petition had been filed. This court is concerned with an attorney taking that long to draft a petition for a writ of habeas corpus.

Congress has recognized that petitions for writs of habeas corpus are entitled to prompt resolution. Rule 4 of the Rules Governing § 2254 Cases provides that after a petition for a writ is filed it "shall be presented promptly to a judge ..." and then "[t]he petition shall be examined promptly by the judge to whom it is assigned." Rule 81(a)(2), of the Federal Rules of Civil Procedure limits the amount of time the respondent has to respond to the writ or show cause order in a proceeding under 28 U.S.C. § 2254, by providing for an extension of time not to exceed 40 days.

The United States Supreme Court has stated that "[m]oreover, once a state prisoner arrives in federal court with his petition for habeas corpus, the federal habeas statute provides for a swift, flexible, and summary determination of his claim." *Preiser v. Rodriguez,* 411 U.S. 475, 485, 93 S.Ct. 1827, 1834, 36 L.Ed.2d 439 (1973).

The purpose of a swift and summary remedy is thwarted when a petitioner's lawyer never invokes judicial review by filing a petition.

Pearson appears to have spent 20 months on the case primarily performing research and then 6 months later he provided a petition for filing. The nature of at least two of Williams' problems merited research. The status of the law with regard to federal court habeas corpus review of claims barred from review in State courts and the impact of claims of ineffective assistance of counsel on those barred claims has been the subject of recent decisions by the United States Supreme Court. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). In the case of *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), a divided court discussed the proper federal court review of a successive federal petition for writ of habeas corpus. Although research was necessary, 20 months was not necessary to complete 30–50 hours of work composed primarily of weekend research. A client does not usually engage the professional services of a lawyer for him to spend a few hours on a weekend once a month in the hope a filing suit in two years. However, the allegation of misconduct is based on neglect and our inquiry must focus on whether Pearson's actions demonstrate neglect as that term is used in DR 6–101.

The Court has quoted with approval a definition of "neglect" found in an Informal Opinion of the American Bar Association. *State ex rel. Oklahoma Bar Association v. Peveto*, 620 P.2d 392 (Okl.1980). We stated that neglect

" '... involves indifference in and consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client. The concept of ordinary negligence is different. Neglect usually involves more than a single act or omission. Neglect cannot be found if the acts or omissions complained of were inadvertent or the result of error of judgment made in good faith.' " *Id.* 620 P.2d at 394.

Pearson's actions were more akin to an error of judgment than neglect. His representation of Williams involved the balancing of two competing interests of his client. One interest was the research and preparation of the case prior to filing the petition. The second was prompt and swift adjudication of Williams' claims. While thorough research and preparation of a case prior to filing the petition is a commendable goal, at some point the research must stop and the petition must be filed. Pearson recognized this principle in his testimony.

"And what I have learned, I should have done in December '85. By that time we knew the problems. We didn't know they were insoluable. Probably by sometime in '86, we pretty well concluded they were insoluble. It wasn't a light switch turning on kind of thing. I should have said Lawrence here are our problems: A, B, C and D. And your alternative is to either to file this now as it stands and lose or not." (Tr. at 110).

Pearson wanted his client to win and he continued to do research to find a way to accomplish that goal. His research continued to indicate a petition for habeas corpus would be fruitless and so he delayed the filing of the petition. Ultimately the petition and supporting brief were delivered to the client. Pearson's representation does not amount to a conscious disregard for the responsibility owed to Williams. The allegation that Pearson violated DR 6–101(A)(3) is not supported by the evidence.

## III. CONCLUSION

A Complaint was filed by the Oklahoma Bar Association alleging that the respondent's conduct violated DR 6–101(A)(2) and (3); and DR 7–101(A)(1), (2), and (3) of the Code of Professional Responsibility. The Complainant subsequently dismissed its Complaint insofar as it pertained to DR 6–101(A)(2). The evidence submitted to the trial panel of the PRT does not show that respondent violated DR 6–101(A)(3); or DR 7–101(A)(1), or (2), or (3) of the Code of Professional Responsibility. The Com-

plaint in case SCBD 3486 against James Pearson is hereby ordered dismissed.

All the Justices concur