STATE of Oklahoma, ex rel. OKLA-
HOMA BAR ASSOCIATION,
Complainant,

v.

Frank MISKOVSKY, III, Respondent.

SCBD No. 3666.

Supreme Court of Oklahoma.

Sept. 17, 1991.

As Corrected Oct. 9, 1991.

John E. Douglas, Asst. Gen. Counsel, Dan Murdock, Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for complainant.

Frank Miskovsky, III, pro se.

LAVENDER, Justice.

■ Disciplinary proceedings were initiated against respondent, Frank Miskovsky, III, alleging six counts of misconduct. Complainant, Oklahoma Bar Association, alleged in count one commingling of client funds with his own, failing to deposit funds entrusted to him to pay client medical bills in a separate account, failing to pay some of the medical bills as promised and misrepresenting to the clients all medical bills had been paid when they had not. Count two alleged failure to fully cooperate in the investigation of count one by failing to produce bank records requested by complainant and ultimately subpoenaed and failing to appear at scheduled deposition(s) for which he was subpoenaed. Count three charged commingling client funds, failing to place the funds in a separate account and use them for a particular specified purpose, conversion of the funds and intentionally prejudicing the client by the handling of the involved funds. Count four essentially charged misconduct by respondent's failure to provide records he indicated he reviewed in responding to the grievance which had initiated the investigation leading to count three and to appear at scheduled deposition(s).[1] Count five also charged commingling of client funds and conversion. Count six was a charge under Rule 5.2 of the Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A.

A Professional Responsibility Tribunal (PRT) found certain violations in regard to the first five counts and that other matters charged therein were not proven. It found

---

1. Counts two and four, which essentially charged failure to produce records after request by complainant and after subpoenas had been issued to respondent by the Professional Responsibility Commission and failure to appear at respondent's own scheduled deposition(s), indicated the charge was being lodged pursuant to Rule 5.2, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A. We have carefully reviewed the complaint in regard to these counts and are convinced they do not charge violations of Rule 5.2. Rule 5.2 makes a *deliberate misrepresentation in a written response to a grievance submitted to a lawyer* grounds for discipline. *See State ex rel. Oklahoma Bar Association v. Miskovsky*, 804 P.2d 434, 439 (Okla.1990). It also provides *failure to answer a grievance in a timely manner shall constitute grounds for discipline.* Count two *does not even mention respondent's written response to the grievance* submitted to him in regard to count one. Although count four partially concerns matters set forth in respondent's response to the grievance submitted to him in regard to count three and his failure to amend the response, it certainly *does not* expressly charge a deliberate misrepresentation in the response nor that the response was not submitted to complainant in a timely manner. Rather than charging violation of Rule 5.2, the substance of the two counts primarily charge violation of Rule 8.1(b) of the Rules of Professional

Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, which provides in pertinent part, "a lawyer ... shall not ... fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, *or knowingly fail to respond to a lawful demand for information from a[ ] disciplinary authority ....*" (emphasis added)

Only last year we determined a complaint *did not* have to set forth the specific disciplinary rule deemed violated, as long as the facts alleged sufficiently notified a lawyer of the accusation against him. *State ex rel. Oklahoma Bar Association v. Moss*, 794 P.2d 403, 407–408 (Okla.1990). The substance of counts two and four sufficiently notified respondent he was charged with a violation of conduct covered by Rule 8.1(b). Further, it is quite obvious respondent knew he was charged with failing to provide the requested records or to appear at his scheduled deposition(s), by a review of respondent's own testimony at the hearing before the PRT, as elicited through his counsel. Finally, although respondent raises a purported denial of due process in regard to these counts which we will discuss *infra,* the purported denial *does not allege insufficiency of the complaint to inform him of the substance of the charges lodged against him in counts two and four.* We will, thus, determine whether a violation of that rule occurred.

no violation as to count six.[2] The PRT recommends a six month suspension. Complainant argues for more severe discipline. Respondent contests the PRT's findings of misconduct and as to counts two and four he contends he was denied due process because the first notice he had of those charges was in the complaint, rather than via an earlier grievance or recitation of facts or allegations, he says should have been sent to him by complainant informing him it was contemplating requesting the Professional Responsibility Commission to direct it to lodge said charges in a formal complaint.

Although we agree with some of the findings and conclusions of the PRT our agreement is not total. We also rule more severe discipline is warranted and that respondent's due process argument is meritless.

## STANDARD OF DETERMINATION IN BAR DISCIPLINARY PROCEEDINGS

 In disciplinary matters we are a licensing court acting in the exercise of our exclusive jurisdiction. *State ex rel. Oklahoma Bar Association v. McMillian,* 770 P.2d 892, 894 (Okla.1989). Our determinations are made *de novo* and neither the findings of fact of the PRT nor its view of the weight of the evidence or credibility of witnesses are binding on us. *Id.* Further, no presumption of correctness attaches to the findings or conclusions of the PRT. *Id; State ex rel. Oklahoma Bar Association v. Braswell,* 663 P.2d 1228, 1230 (Okla.1983). Although a PRT's recommendations are accorded great weight they are merely advisory. The ultimate decision-making authority rests with us. *McMillian, supra; State ex rel. Oklahoma Bar Association v. Samara,* 683 P.2d 979, 984 (Okla.1984). Finally, to warrant a finding against a lawyer in a contested case the charges must be established by clear and convincing evidence. Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1,

App. 1–A. With these principles in mind we turn to a discussion of the misconduct charged.

## COUNT I

Donald and Kelly Franks (Frankses) retained respondent in November 1987 to represent them in claims for injuries suffered in an automobile accident. According to a written attorney employment contract respondent was to receive as his fee 30% of any settlement made before suit was actually filed, 35% of any settlement made after suit was filed and 40% of any settlement or judgment secured after the matter was set on a trial docket. The fee was to be calculated after expenses of suit (if any), and investigation or fees of witnesses were first paid in full out of settlement or judgment proceeds. The contract authorized respondent to pay directly to any physician or hospital any bills incurred by the Frankses for medical treatment. As we interpret the contract, and as agreed by complainant, respondent's fee was to be calculated *prior to* any deduction for medical expenses. The matter settled before suit was filed.

In January 1988 respondent received a partial settlement of $22,000.00. The money was deposited in respondent's regular checking account, rather than a separate or trust account for client funds. However, money was paid out in accordance with the employment contract on or about the date of deposit. The clients received $15,400.00 (70%) and respondent $6,600.00 (30%).

In February 1988 respondent received an additional $42,500.00 as a final settlement. Respondent agreed to pay the medical providers owed money by the Frankses. He prepared a settlement statement regarding distribution of the money. Investigation costs of $400.00, the cost of three doctors reports apparently obtained for potential use in the case at $200.00 total and *estimated* medical expenses of $2,000.00 were initially deducted from the $42,500.00. He then calculated his attorney fee at 30% of

---

**2.** Complainant does not contest the PRT's finding it failed to carry its burden of proof in relation to count six. Accordingly, we will ac-

cept the recommendation of the PRT which found no violation as to said count.

the remainder, i.e. 30% × $39,900.00 for an attorney fee of $11,970.00. The deducted medical expenses *were not* put in a separate or trust account for client funds, but were placed in respondent's regular checking account.[3] The Frankses were paid $27,903.00 on or about February 16, 1988. Problems soon began to surface.

First, the medical expenses were underestimated $231.88. Respondent sent an adjusted settlement statement to the Frankses dated February 17, 1988 reflecting the new amount for medical expenses. He also requested $134.88, a sum he calculated would cover the underestimation. The Frankses sent a check in that amount.

The next problem was the Frankses began to receive inquiries from some of the medical providers in March or April indicating medical bills had not been paid. Respondent had previously informed them via a letter which accompanied the adjusted settlement statement of February 17, 1988, *he had* sent checks directly to all medical providers shown on the statement. They contacted respondent who assured them checks had been mailed shortly after February 16th to the providers and he requested they wait a full thirty day billing cycle to see if that would end the problem. It did not and more inquiries and requests to pay from some of the medical providers were made. The Frankses paid some of the bills themselves.

At the hearing before the PRT respondent appeared to testify *he did* write checks to all the medical providers shortly after February 16th and he had no definitive explanation for them not being received by any of the medical providers. He

has never produced any check stubs or any other tangible documentation evidencing these "missing" checks. It is our view that although respondent may indeed have sent or, at least, started the process in motion to have one of his temporary secretaries he had during this time period send *some* of the payments for medical bills, the record evidence and the inferences to be drawn therefrom shows respondent *had not* sent out checks *to all* the medical providers he had bills for at the time he told the Frankses he had. The record also shows respondent ultimately paid *only* $1,095.63 to some of the medical providers on or about April 29, 1988, even though he was entrusted with $2,134.88 by the Frankses for the *express* purpose of paying their medical bills.

The third problem to surface was respondent figured his fee wrong. Although the record shows the Frankses were under the mistaken view medical expenses should have been deducted *prior to* calculating respondent's fee at 30%, the employment contract, as noted, does not so provide. Obviously, if medical expenses *are not* deducted first respondent's fee would be higher because the 30% is multiplied by a larger sum. By letter of May 18, 1988 respondent informed the Frankses of what he perceived to be the miscalculation and he requested they send him a check for $850.00. He was now apparently figuring his fee based on 30% of the entire final settlement of $42,500.00, without inital deduction for any investigation expenses (i.e. $600.00). Respondent's new calculation again proved incorrect. We have determined the correct fee to be $12,570.00, which is 30% of $41,900.00.[4]

3. Respondent's trust account records were never produced by him even though he was requested to produce applicable records by complainant. Further, although respondent on his 1988 dues statement to the Oklahoma Bar Association indicated he had a client trust account at a Liberty National Bank and Trust Company of Oklahoma City, a response letter to a subpoena duces tecum from said bank admitted into evidence at the hearing before the PRT informed complainant said trust account *had been closed* prior to February 1988. The trust accounting certificate on respondent's 1988 dues statement and signed by him is dated March 31, 1988. Thus,

the record seems to show respondent had no trust account for client funds in February 1988.

4. Complainant, in our view, miscalculated to the detriment of the Frankses what *should have been* respondent's fee when it presented its case to the PRT because it failed to initially deduct $200.00 in the form of three doctors' reports. Respondent's own settlement statements show he *initially* considered the $200.00 deductible *prior to* calculation of his fee. The exact nature of the reports is not shown by the record. In that respondent himself determined the $200.00 *should be deducted first* and the doctors' *reports,* as opposed to debts of the Frankses for medical

In the final analysis, respondent took more than $12,570.00 and he presently owes the Frankses $466.25. He has had use of this sum since early 1988. We arrive at this figure as follows. Initially, the Frankses were given a check for $27,903.00 by respondent out of the final settlement proceeds. Pursuant to his request they gave him $134.88 back purportedly to cover the wrong estimation of medical expenses. Therefore, the Frankses received a total of $27,768.12 in *actual* dollars out of the final settlement proceeds. Respondent, therefore, retained $14,131.88, i.e. $41,900.00 minus $27,768.12. In that he applied $1095.63 of this retained money to medical bills of the Frankses this amount was obviously not ultimately retained by him. After the $1095.63 is deducted from $14,131.88 it is seen respondent ultimately kept $13,036.25, which is $466.25 more than the appropriate fee he was entitled to under the employment contract.[5]

Respondent argues the matter involves merely a. fee dispute.[6] Although it does involve partially a dispute over fees, it involves much more. In his dealings with the Frankses he engaged in professional misconduct and he is simply mistaken in the view his conduct can be brushed aside as a dispute over fees.

■ He violated DR 1–102(A)(4), 5 O.S. 1981, Ch. 1, App. 3, when he misrepresented to his clients all medical bills had been paid when they had not been paid.[7] He violated DR 9–102, 5 O.S.Supp.1983, Ch. 1, App. 3, by failing to place any of the funds of the Frankses, particularly the funds given to him for the express purpose of paying medical bills, into a separate or trust account, and commingling these funds with his own in a regular checking account. He also violated Rule 1.4(b) of the Rules Governing Disciplinary Proceedings by failing to use the money entrusted to him (i.e. $2,134.88) for the specific purpose of paying medical expenses.[8]

■ The Rules *do not* allow a lawyer to take funds entrusted to him for a specific

treatment, *might* be viewed as some type of investigation expense, which the employment contract *requires* to be deducted first, we have determined to deduct such expense first, along with the other $400.00 in investigation costs shown on the settlement statements. No coherent explanation has ever been put forward by respondent that this $600.00 should not be deducted prior to his fee being calculated. Therefore, the fee of $12,570.00 is determined by subtracting the $600.00 in deductible expenses from the $42,500.00 and then multiplying this amount ($41,900.00) by .30, i.e. 30%. We note respondent's *total* allowable fee under the contract was really $19,170.00 when one considers the initial partial settlement he recovered of $22,000.00. However, in that this sum was properly divided and the amount he ultimately owes his clients can be figured without bringing this initial partial settlement back into the picture we have decided to concern ourselves only with the final settlement of $42,500.00. We would also note the record shows respondent assisted in recovering a sum for property damage, but none of the parties figure this into the fee equation. We will not either.

5. Respondent appeared to acknowledge as early as his written response to the Frankses' grievance he owed someone at least $150.00 because of the miscalculations he had made in splitting up the $42,500.00 final settlement. He testified at the hearing before the PRT he was not sure who the money should go to, however, the Frankses or doctors that might still be owed.

6. Rule 1.4(d) of the Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, provides, "[c]ontroversies as to the amount of fees shall not be considered a basis for charges in a disciplinary proceeding unless it is made to appear that the amount demanded is extortionate or fraudulent."

7. DR 1–102(A)(4), 5 O.S.1981, Ch. 1, App. 3, provided "[a] lawyer shall not ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

8. Rule 1.4(b) provides:

Where money ... has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or setoff for fees against any money ... of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services.

The PRT's report does not find a violation of Rule 1.4(b) and complainant does not appear to contest the absence in its briefs to us. However, the record before us shows a clear violation of Rule 1.4(b), one that was charged in the complaint and proven by clear and convincing evidence.

purpose and apply them to what he considers his rightful fee. Another case in which this respondent received discipline makes clear Rule 1.4(b) *does not* allow an attorney to use funds entrusted to him for a specific purpose to offset attorney fees. *State ex rel. Oklahoma Bar Association v. Miskovsky*, 804 P.2d 434, 438 (Okla.1990).[9] Although he never admits it we believe the evidence shows at some point in time respondent decided to forego paying some of the medical expenses, because he *finally* figured out he had calculated his fee incorrectly.

Respondent has a serious misconception of the above rules if it is really his view the situation involved merely a fee dispute. To the contrary, the record concerning count one shows respondent is guilty of misconduct violative of the Code of Professional Responsibility and the Rules Governing Disciplinary Proceedings.[10]

## COUNT III

Count three involves respondent's representation of Stanley Kratky on a criminal charge of actual physical control of a vehicle while under the influence of drugs. Kratky pled guilty on May 18, 1987. He received a two year deferred sentence and was ordered to pay a fine of $200.00, a victim compensation assessment of $100.00 and costs of $54.00, for a total of $354.00. Respondent signed a Deferred Sentence, Plea of Guilty Summary of Facts form *dated May 18, 1987 detailing said costs*. Kratky's mother gave respondent a check to pay the items on May 18, 1987 or shortly thereafter. The check bears the notation court costs. The check was not deposited into a separate or trust account, but into an account respondent testified was for fees and costs. Respondent *did not* pay the items.

Later, apparently in early 1989, it was discovered by Kratky's probation officer(s) the fine and costs were not paid. A grievance was lodged with complainant. In April 1989 the Kratkys paid the $354.00 to the court clerk apparently to insure Kratky would come off the deferred sentence.

In a written response to the grievance respondent said he had reviewed his records and had determined the $354.00 was applied to other sums owed to him by Kratky. No records showing this application were ever produced by respondent. At the hearing before the PRT respondent acknowledged he had made a mistake. He indicated he paid the $354.00 back to the Kratkys in September 1989. Although it is somewhat unclear from his testimony respondent appeared to assert at the hearing before the PRT the mistake may have occurred because during the period of time involved he had only *temporary* secretaries working for him.

■ In our view the record shows respondent violated DR 9–102 by not placing the money in a separate or trust account and DR 7–101(A)(3), 5 O.S.1981, Ch. 1, App. 3, which prohibits a lawyer from intentionally prejudicing or damaging a client during the course of the professional relationship. The client, although he did apparently come off the deferred sentence, was prejudiced because failure to pay the costs, etc. potentially subjected him to acceleration of sentencing and prison time. Even if this *potential* prejudice itself would not

9. The misconduct found to exist in *State ex rel. Oklahoma Bar Association v. Miskovsky*, note 1, *supra*, was not relied on in an attempt to enhance punishment apparently because that case was not decided when the complaint in the instant matter was filed.

10. Respondent was also charged in count one with violating Rules 1.15 and 8.4 of the Oklahoma Rules of Professional Conduct, which *went into effect July 1, 1988*. 5 O.S.Supp.1988, Ch. 1, App. 3–A. Rule 1.15 of the new Rules is essentially the corresponding provision to DR 9–102 and 8.4 to old DR 1–102. The PRT made no explicit conclusions as to these provisions. We assume complainant charged violations of these provisions because it felt respondent's conduct as to handling of the funds and his representations to the Frankses should be viewed as a continuing violation overlapping into a violation of the new Rules. In that complainant does not contest their absence from the PRT report in its briefs filed here and findings or conclusions in regard thereto by us would add nothing to a full understanding of the matter or effect our determination as to discipline, we do not believe a decision needs to be reached concerning the provisions.

be sufficient to find a violation of DR 7–101(A)(3), Kratky was also prejudiced by having to deal with his probation officers concerning non-payment. Finally, although it appears Kratky's mother paid the costs in 1989, the client was prejudiced in having to secure payment of the items twice. Although these latter two prejudicial results were not specified by the PRT they are born out by the charge against respondent and are apparent from the record.

■ It is no excuse that a secretary of respondent may have "caused" what respondent eventually acknowledged was a mistake concerning the $354.00. A lawyer is responsible for work done or entrusted to lay personnel employed by him and he must supervise that work. *State ex rel. Oklahoma Bar Association v. Braswell, supra,* 663 P.2d at 1231–1232. Furthermore, whether he views it merely as a "mistake" or not, respondent's conduct exhibited gross negligence because the record shows not even slight care was used by respondent once he received the $354.00. We have determined for purposes of DR 7–101(A)(3) gross negligence is the legal equivalent of intentional conduct. *Id.* at 1232. *State ex rel. Oklahoma Bar Association v. Pearson,* 767 P.2d 420, 425 (Okla. 1989). As noted above, respondent himself executed the guilty plea form which definitively set out the $354.00 his client owed and he was given a check in that amount the same day or shortly thereafter.

■ Respondent was also charged in count three with violating DR 1–102(A)(3), 5 O.S.1981, Ch. 1, App. 3, which prohibits a lawyer from engaging in illegal conduct involving moral turpitude. Apparently, complainant's position in regard to this charge was that respondent's *conscious* intention from the beginning was to steal the

money and convert it. The PRT did not so find.[11] We, like the PRT, do not believe complainant proved its case by clear and convincing evidence under DR 1–102(A)(3) and, accordingly, we do not find a violation of that provision.

## COUNT V

■ Count five charged commingling of client funds with his own by failing to place settlement proceeds in a separate or trust account and conversion. Rule 1.15 of the Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, was the provision alleged violated.[12] Although we find respondent guilty of commingling we determine the evidence does not show conversion.

In 1988 respondent was retained by Matt and Melanie Crumrine to represent their interests arising from a vehicular accident. At the time of the accident Matt and Melanie were engaged and were married shortly thereafter. When they contacted respondent they were married. This marriage discussion has importance because the PRT partially relied on the fact the couple was not married at the time of the accident to determine there was a conversion. The case potentially had several facets, one of which was recovery for injury to Melanie's back. This facet was settled in November 1988 for an amount of $4,500.00, with an insurance company draft being received by respondent on November 9, 1988.

The draft was deposited into respondent's regular checking account at Metro Bank of Oklahoma City on November 9th. On the same date respondent paid a Dr. Chumley $1275.50 which was a doctor bill incurred by Melanie.[13] As the PRT recognized, there is considerable confusion in the record as to what was paid to the Crumrines and when it was paid. There is also

11. In its initial brief to this Court complainant asked us to adopt the findings and conclusions of the PRT as to count three. The report of the PRT found no conscious effort to convert the money, but characterized the affair with Kratky as one involving inadvertence on respondent's part.

12. As previously mentioned at note 10, *supra,* Rule 1.15 is the new provision essentially corresponding to DR 9–102.

13. Respondent's check to Dr. Chumley shows a date of October 11, 1988, but records admitted concerning respondent's account at Metro Bank indicate it was received at his bank November 9, 1988.

confusion as to whether *anything at all was owed to the Crumrines at the time respondent received the settlement check* because of other dealings respondent had with Matt of a non-legal nature, i.e. sale of a truck by respondent to Matt either for monetary payment or in trade for training by Matt of horses owned by respondent, and other legal work he had done or was doing for the Crumrines at the time.

Complainant's position as to conversion was to the effect that because the Metro Bank account was overdrawn at certain times in November 1988, if the Crumrines were not paid what they were owed by respondent before it was overdrawn a conversion occurred. It also appears to assert his bank records show at least some of the settlement proceeds were used for respondent's personal benefit. Instead of making an explicit determination on complainant's position in such regard, the PRT found a conversion occurred through the following logic. In that the settlement was for injury to Melanie's back and the Crumrines were not married at the time of the accident the cause of action for said injury was entirely hers. Further, the PRT found because the record does not indicate "and her testimony would indicate to the contrary", she ever agreed to the use of the settlement proceeds to pay the apparent debt on the truck, until it was finally determined what, if anything, Melanie should have received, the failure to keep the remainder of the proceeds (i.e. after payment to Dr. Chumley) in a trust account amounted to a conversion. We disagree.

Both Crumrines acknowledge the truck sale and its later recision, apparently in late December 1988 or January 1989, because they had an opportunity to move to

Italy. They differ with respondent as to whether the sale was for cash or was to be in trade for the horse training, however. From what we can determine from the record, about a month or two before the settlement check was received respondent sold a truck to Matt. Matt said the truck was traded for some work he was to do for respondent in the form of training some horses, but respondent says it was sold for $2,500.00. It was respondent's position that at the time the check was received there was more owed to him for previous representations, the truck purchase price and his fee in regard to the instant matter, than the $4,500.00 would cover.

Although the record does not expressly indicate Melanie agreed to use of the settlement funds to pay the truck purchase price it certainly does not indicate the contrary. In fact, a fair reading of her testimony is that she was basically leaving the matter to her husband. A fair reading of her testimony could also support the conclusion she *did* agree to treat the proceeds as *joint* property with Matt.

It must be remembered the burden was on complainant to prove, and we must find *by clear and convincing evidence,* a conversion occurred. Rule 6.12, Rules Governing Disciplinary Proceedings, *supra.* Although the record might be viewed as showing a conversion it is by no means shown by clear and convincing evidence and in such a situation we decline to rule a conversion occurred.[14] Therefore, only that part of count five alleging commingling of client funds by failure to place the settlement proceeds in a separate or trust account is made out by this record. Clearly, the record shows that because at least

---

**14.** We simply cannot credit *in toto* Matt's or Melanie's testimony in regard to their dealings with respondent and the documentary record *alone* does not show a conversion. The testimony of Matt is not particularly worthy of credit because it shows his memory of key events was lacking. Melanie's testimony showed, although she had some dealings with respondent, she was not sure what was transpiring because she was leaving the matter up to Matt. Some of what she testified to appears to be based more on impressions, rather than actual knowledge. By these statements we are not intimating any intentional fabrication on their part, but only that their testimony, coupled with the documentation, is not sufficient to make out a case of conversion by clear and convincing evidence. We also note the PRT's apparent finding the Crumrines or, at least, Melanie, disputed what was owed *at the time* respondent received the settlement proceeds is not shown by clear and convincing evidence. Based on their own testimony we are not convinced either of them ever really disputed what was owed or made such known to respondent at any relevant time.

some of these funds were to go to Dr. Chumley to pay Melanie's medical bill they could not be placed in respondent's regular account.[15]

## COUNTS II AND IV

As mentioned at note 1, *supra,* we have determined counts two and four charge violations of Rule 8.1(b) of the Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A. They concern respondent's failure to provide records requested by complainant and subpoenaed by the Professional Responsibility Commission (PRC) and his failure to appear for scheduled deposition(s). Prior to turning to a discussion of the substance of these counts we initially must dispose of a constitutional argument raised by respondent.

### A. DUE PROCESS ARGUMENT

▆ Respondent asserts he was denied due process in regard to these counts apparently under either OKLA. CONST. art. 2, § 7 or the U.S. CONST. amend. XIV, § 1. He contends the denial occurred because a grievance or recitation of facts and allegations was not first presented to him for response *prior to* the allegations being presented to the PRC for a determination of whether the PRC would direct the filing of a formal complaint against him charging misconduct.

Rule 5.2 of the Rules Governing Disciplinary Proceedings provides as follows:

After making [a] preliminary investigation as the General Counsel [of complainant] may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete, or insufficient to warrant the further attention of the [PRC], provided that such action shall be

reported to the [PRC] at its next meeting, *or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the [PRC] without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds.* Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of the lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action. (emphasis added)

Rule 5.3 of the Rules Governing Disciplinary Proceedings, 5 O.S.Supp.1987, Ch. 1, App. 1–A, next provides upon completion of the investigation a report and recommendation shall be made to the PRC which is given authority to take various steps, one of which is directing the filing of a formal complaint with this Court. Rule 5.3(d).

Although the quoted language from Rule 5.2 does not literally contain an exception for sending a recitation of facts and allegations for response even for investigations concerning violations of Rule 8.1(b) prior to presentation to the PRC for authorization to include said charges in a formal complaint, we believe failure to do so in this case *in no way implicates a due process violation.*[16]

---

**15.** There is considerable evidence in the record concerning payments made to the Crumrines to finally settle the matter once it became clear they were going to move to Italy and respondent agreed with Matt to rescind the truck sale. We do not believe it would serve any purpose to detail these payments. Suffice it to say no finding could be drawn respondent currently owes any money to either of the Crumrines from the

instant record. The PRT made no such finding and complainant has in no sense proved that such is the case or really ever tried to prove such in this case.

**16.** We have ruled the fundamentals of due process are applicable in lawyer disciplinary matters *State ex rel. Oklahoma Bar Association v. Lobaugh,* 781 P.2d 806, 811 (Okla.1988).

Respondent was given *specific* notice of the charges lodged in counts two and four via the complaint. He had ample opportunity to defend against the charges contained therein, *including the charges stemming from purported violations of Rule 8.1(b).* Further, the hearing in this matter was conducted over a two day period, *the second day coming almost two months after the first day.*[17] Finally, the record here shows respondent was allowed to cross-examine *all* witnessess presented by complainant and was allowed to present evidence in support of his defense(s). Based on these factors there simply was no due process violation in regard to the charges lodged in counts two and four. There was also no proof by respondent of even minimal prejudice by failure to send him for response a recitation of facts and allegations prior to presentation to the PRC.[18]

## B. FAILURE TO PROVIDE RECORDS— COUNTS TWO AND FOUR

 The evidence as to count two shows respondent was requested by complainant to provide his trust account records from February 1988 through April 1988. He was initially requested to provide such at a deposition taken of him on May 23, 1989 and he agreed to produce them by June 26, 1989. Because he did not provide them complainant had the PRC issue a subpoena duces tecum to respondent for the records in July 1989, this time demanding trust account records from February 1988 through the date of his May deposition. The records were requested to investigate the Frankses' grievance, particularly in an effort to determine how respondent handled the final settlement proceeds and because respondent had led complainant to believe in his May 1989 deposition he may have been holding a small amount of money on the Frankses' behalf in his trust account.

By the time the above subpoena was sought the Kratky grievance had arisen and the subpoena was also issued to respondent to produce records he said he had reviewed in preparing his written response to that grievance. The subpoena demanded respondent appear for his deposition, with the requested records, on August 3, 1989. Respondent did appear, but stated he had pressing personal business. The deposition was rescheduled for August 10, 1989. On August 10, 1989 respondent again appeared, but indicated he wanted to retain counsel before proceeding. Counsel was apparently then retained by respondent. Said counsel contacted complainant to find out exactly what records were demanded. Although the deposition was not rescheduled, counsel for respondent apparently indicated he could produce the records within five days. When the records were not produced another subpoena duces tecum to respondent was issued requiring that he bring the requested records. At the scheduled date in September 1989 for production of the records and to take the deposition of respondent his counsel appeared, but respondent did not. The explanation given by his counsel was that respondent had a conflict in that he was on a trial docket in Oklahoma County in a divorce case. The subpoenaed records have never been produced by respondent.

Respondent did give certain explanations at the hearing before the PRT for his failure to provide the records. He indicated he thought the records were at his accountant's office, they at times were with an Internal Revenue Service auditor or he had just misplaced them. None of these "explanations" were made in any response to the subpoenas. He also indicated he took no further steps to locate the requested documents in the Frankses' matter after he received copies of subpoenas issued by the PRC at complainant's request to certain

---

17. The first day was on March 27, 1990 and the second on May 21, 1990.

18. We have ruled in an analogous situation, "in the absence of any proof of even *minimal* prejudice, the public interest in the ethical practice of law outweighs any blind devotion to proce-

dure." *See State ex rel. Oklahoma Bar Association v. Lowe,* 640 P.2d 1361, 1362 (Okla.1982) (without any showing of prejudice long delay in disciplinary proceeding in violation of time limits is not cause for dismissal of charges).

banks thought to be the location of his trust account(s). He testified he felt that was the easiest way for complainant to obtain the documents it wanted. He further testified he told the attorney that was then representing him in the disciplinary matter that he was not holding any money in a trust account on behalf of the Frankses and he generally left the matter concerning document requests up to his counsel.

It is our view the record in regard to counts two and four made out a violation of Rule 8.1(b) for failure of respondent to respond to a lawful demand for information from a disciplinary authority. Respondent has never produced any trust account records or the records he reviewed as to the Kratky matter. Further, he never raised any specific objection to production of the records that might excuse his failure in such regard or that he did not have the records at the time specified for compliance in the subpoenas. He, therefore, violated Rule 8.1(b) and engaged in misconduct warranting discipline.

### DISCIPLINE

The purpose of a disciplinary proceeding is not to punish the lawyer, but to inquire into his continued fitness to practice with a view to safeguarding the interest of the public, the courts and the legal profession. *State ex rel. Oklahoma Bar Association v. Raskin*, 642 P.2d 262, 267 (Okla.1982). In *State ex rel. Oklahoma Bar Association v. Moss*, 794 P.2d 403, 411 (Okla.1990), we set forth numerous cases involving commingling client funds. We noted therein the cases cited involved varying degrees of culpability on the part of the involved attorneys in the mishandling of clients' funds. *Id.* For the cases listed sanctions imposed ran from public reprimand to disbarment. *Id.* We further ruled in *State ex rel. Oklahoma Bar Association v. Miskovsky, supra*, 804 P.2d at 438, that where a case of misappropriation of client funds does not involve fraud or deceit disbarment is not necessarily warranted. The only misrepresentation found

to exist on this record was in regard to the Frankses' matter where we have found respondent told his clients he had paid all the medical bills when he had not. However, in the Frankses' matter the record shows respondent's conduct, rather than involving an intention to steal his clients' money, to a certain degree involved his inability to properly determine his fee. As we noted *supra*, however, such was no excuse for failing to pay the medical bills he had been given funds to pay.

From reviewing the entire record we believe respondent's conduct in regard to each of the three substantive counts (i.e. Franks, Kratky and Crumrine) exhibited woefully sloppy, neglectful and at times incompetent record keeping instead of theft by conversion.[19] In *Moss, supra*, we noted such type of conduct warranted a two year and one day suspension. 794 P.2d at 411. We also noted in *Moss* the mishandling of client funds was not an isolated incident, as it is not here. Therefore, for the professional misconduct found to exist by this record, including the violations of Rule 8.1(b), we conclude respondent should be suspended for a period of eighteen (18) months.

IT IS THEREFORE ORDERED respondent shall be suspended from the practice of law for a period of eighteen (18) months from the date this opinion becomes final.

IT IS FURTHER ORDERED respondent shall pay the costs of the instant proceedings in the amount of $2,190.00 within ninety (90) days from the date this opinion becomes final.

IT IS FURTHER ORDERED respondent make restitution in the amount of $466.25 to the Frankses within thirty (30) days from the date this opinion becomes final.

DOOLIN, HARGRAVE, KAUGER and SUMMERS, JJ., concur.

SIMMS, and ALMA WILSON, JJ., dissent.

OPALA, C.J., not participating.

---

**19.** Theft by conversion of a client's funds mandates disbarment under Rule 1.4(c) of the Rules

Governing Disciplinary Proceedings. 5 O.S. 1981, Ch. 1, App. 1–A, Rule 1.4(c).

SIMMS, Justice, dissenting.

I would respectfully dissent. I would suspend the respondent for four (4) years.