1997 OK 83

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Ernest A. BEDFORD, Respondent.**

**SCBD No. 4109.**

Supreme Court of Oklahoma.

July 8, 1997.

Rehearing Denied Feb. 2, 1998.

Mike Speegle, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for Complainant.

James E. Frasier, Tulsa, for Respondent.

WATT, Justice.

¶ 1 The Oklahoma Bar Association filed a complaint against respondent, Ernest A. Bedford, alleging two counts of professional misconduct. The two counts charged various violations of the *Oklahoma Rules of Professional Conduct* ("ORPC"), 5 O.S.1991, Ch. 1, App. 3–A. At the conclusion of a hearing, the Trial Panel found that all but one of the allegations against respondent had been proved by clear and convincing evidence. The Panel recommended that respondent be suspended from the practice of law for a period of two years and that he be assessed the costs of these proceedings. The OBA argues that all of the alleged violations were proved by clear and convincing evidence and urge that respondent be suspended for a minimum of two years and one day.

¶ 2 In bar disciplinary proceedings, this Court exercises exclusive original jurisdiction as a licensing court. *State ex rel. Oklahoma Bar Ass'n. v. Gasaway*, 810 P.2d 826, 830 (Okla.1991). The ultimate responsibility for deciding whether misconduct has occurred and what discipline is appropriate rests with this Court. *Id.* "Before we may impose discipline upon an attorney, the charges must be established by clear and convincing evidence." *Id.*, citing Rule 6.12 of the *Rules Governing Disciplinary Proceedings* ("RGDP"), 5 O.S.1991, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Braswell*, 663 P.2d 1228, 1232 (Okla.1983). On *de novo* review of the record, *see State ex rel. Oklahoma Bar Ass'n v. Wolfe*, 1996 OK 75, ¶ 26, 919 P.2d 427, 432, we find by clear and convincing evidence that respondent has vio-

lated ORPC Rules 1.15(a), (b) & (c), 3.1, 4.1(b), 8.1(a) and 8.4(a), (c) & (d).

## FACTS

¶3 Respondent represented a client, Mr. Harrison, in a personal injury matter that was settled during the month of November, 1994. The parties settled the case for $10,000, the policy limits of the tortfeasor's insurance policy. The insurance carrier, Windsor Group, mailed a draft in that amount to respondent on November 21, 1994, naming respondent and Harrison as payees. Windsor inadvertently omitted as payees on the draft two medical providers who possessed valid liens that had been perfected on the proceeds of any settlement of the claim. Those liens covered hospital and medical bills incurred by Harrison as a result of the injuries he suffered in the accident from which the personal injury claim arose. The liens totaled nearly $20,000.00. Notice of the hospital's lien, which alone exceeded $17,000.00, was received in respondent's office on June 6, 1994, and signed for by his receptionist. Respondent's staff at that time consisted of only the receptionist and himself.

¶4 On Wednesday, November 23, 1994, the day before Thanksgiving, respondent and Harrison appeared together at State Bank and Trust in Tulsa and negotiated the draft for cash. Harrison received $8,000.00, while respondent retained $2,000.00 as an attorney fee. On or about the same day, Valerie Atkinson, a claims representative for Windsor, discovered the medical liens and realized that the medical providers had been erroneously omitted as payees on the draft. She then attempted unsuccessfully to reach respondent by telephone that day to inform him of the error.

¶5 On Friday and Saturday, November 25 and 26, 1994, respondent closed five of the six accounts he held at State Bank and Trust. The closed accounts consisted of a corporate operating account, two corporate trust accounts, a personal account and an account for a separate business. The total amount withdrawn from those accounts totaled over $15,-000.00. The remaining open account was one which respondent co-owned with three other people.

¶6 On Monday, November 28, 1994, Atkinson left a message for respondent on his voice mail advising him that the liens had been discovered and that she had issued a "stop payment" order on the draft. Later that day or the next day, Atkinson and respondent spoke by telephone. Testimony was conflicting as to whether, during that conversation, respondent told Atkinson that the draft had been negotiated for cash or had merely been presented for collection through ordinary banking channels. The parties did agree, however, that Atkinson told respondent that she would reissue a second draft in the amount of $10,000.00 naming as payees the two lien holders, respondent and Harrison. Apparently, respondent said nothing to discourage the issuance of a second draft. Atkinson testified that she would never have issued a second draft if respondent had told her that he had already cashed the first one.

¶7 On November 30, 1994, the second draft with the two medical providers listed as additional payees was mailed to respondent. He negotiated the outstanding bills with the two medical providers, obtained their signatures and deposited the draft in a trust account at Bank of Oklahoma.[1] Respondent then divided the proceeds of the second draft between himself, Harrison and the two lienholders. Respondent gave $6,500.00 to Harrison and a total of $2,403.85 to the medical providers. He kept the remaining $1,096.15 for himself to satisfy an alleged pre-existing attorney fee debt owed by Harrison for respondent's representation of him in a bankruptcy case.

¶8 During the ensuing months, State Bank demanded that respondent repay the dishonored draft plus service charges. Respondent offered to confess judgment as to $2,000.00 and to set up a payment schedule, but the bank declined the offer and negotiations faltered. On February 13, 1995, respondent commenced an action in Tulsa

---

1. According to the hospital's attorney, who kept notes of the conversation, respondent indicated that he was in a hurry to cash the draft because of rumors of impending insolvency of the insurance carrier.

County District Court on his own behalf against Windsor and State Bank. Therein he claimed monetary damages in excess of $10,000.00 as the result of Windsor's negligence in stopping payment on the first draft. He also sought declaratory relief adjudicating his rights and an order requiring that Windsor indemnify him for any monies owed by him to State Bank. In his pleadings, respondent claimed he had no knowledge of the medical providers' liens at the time he cashed the first draft. Because respondent apparently never attempted to serve process on Windsor, the claim against the company was eventually dismissed for want of prosecution.

¶9 Respondent filed a second lawsuit on behalf of the Harrisons against State Bank, the law firm of Conner & Winters, and Andrew R. Turner. Turner is an attorney with Conner & Winters, the law firm representing State Bank in the first lawsuit, and was the author of the initial complaint filed against respondent with the OBA. The evidence was unclear as to the nature of the second lawsuit.

### DISCUSSION

¶10 The Trial Panel concluded that the OBA proved all but one of its allegations by clear and convincing evidence. The Panel found that the OBA failed to prove that respondent knew about the medical provider liens at the time he cashed the first draft. After *de novo* review of the record, we find clear and convincing evidence to establish that respondent had prior knowledge of at least one of the liens when he negotiated the first draft. The evidence supporting this conclusion is summarized below.

¶11 Initially, we find that respondent had imputed knowledge of the hospital's lien at the time he cashed the first draft. As previously stated, a copy and notice of the lien was received by respondent's office, as evidenced by the signature of respondent's receptionist on the return receipt, approximately five months before respondent received and cashed the draft. In *State ex rel. Oklahoma Bar Ass'n v. Braswell, supra.,* this

Court rejected a lawyer's claim that his neglect of a client's legal matter may have been occasioned by the inaction or neglect of his law clerk. We held, "The work of lay personnel is done by them as agents of the lawyer employing them. The lawyer must supervise that work and stand responsible for its product." *Id.,* 663 P.2d at 1231–32. *Accord State ex rel. Oklahoma Bar Ass'n v. Cummings,* 863 P.2d 1164, 1173 (Okla.1993) (Court rejected defense that commingling of funds was caused by lawyer's secretarial staff); *State ex rel. Oklahoma Bar Ass'n v. Miskovsky,* 824 P.2d 1090, 1097 (Okla.1991) (Court rejected defense that failure to pay court costs advanced by client was result of error by lawyer's secretary). Regardless of whether respondent had actual knowledge of the lien, the law holds him responsible for the actions of his employee.

¶12 Moreover, we find clear and convincing evidence to establish that respondent did possess actual knowledge of the hospital's lien when he cashed the draft. By his own testimony, respondent has handled hundreds and possibly thousands of personal injury cases since 1972. He previously dealt with the hospital on other cases in which liens have been filed. The hospital's lien in this case was in excess of $17,000.00. Respondent testified that he usually deposits settlement checks in his trust account, but on this occasion he negotiated the draft for cash on the day it was received. On the following two business days he closed out five of six accounts he had maintained with State Bank for a number of years. The remaining account had three co-owners; it could not have been levied upon to satisfy any charge back against respondent on account of the dishonored draft. The only evidence that respondent did not know about the liens was his direct testimony. As the Trial Panel found—and the record supports—respondent was vague, unresponsive and evasive in answering questions under cross-examination.

¶13 ORPC Rule 1.15 governs the proper manner in which an attorney must safeguard the property of another that comes into his or her possession.[2] The rule pro-

---

2. Rule 1.15 states *inter alia:*

(a) A lawyer shall hold property of clients or

vides in relevant part that an attorney (1) must hold property of third persons separate from the lawyer's own property, (2) shall promptly notify third persons of the receipt of property in which they claim an interest and promptly deliver the same to them, and (3) hold any disputed interests in trust until such dispute is resolved. Respondent violated this rule on two occasions. Two lienholders had a perfected interest in the proceeds of any settlement of the personal injury case. As determined above, respondent was at least aware of the hospital's lien. Notwithstanding, he and his client cashed the first settlement draft and split the proceeds without notifying the hospital of the draft and without delivering the hospital's interest to it. Respondent then negotiated the second draft knowing that the Windsor Group had an interest in the proceeds because it had already paid the total settlement amount via the first draft. As previously stated, Windsor was not aware that the first draft had been cashed when it issued the second draft. Respondent failed to notify Windsor of the error and failed to hold the draft pending resolution of the disputed interests.

¶ 14 The above described actions also violated ORPC Rules 8.4(c) and 4.1(b). Rule 8.4(c) states that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Rule 4.1(b) provides that a lawyer shall not knowingly "fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client...." Respondent violated these rules by cashing the first draft without notifying the hospital. He violated Rule 8.4(c) a second time by negotiating the second draft after already having obtained the full settlement amount and with knowledge that Windsor had an interest therein.

He violated Rule 4.1(b) a second time by failing to inform Windsor, upon receipt of the second draft, that he had already negotiated the first draft for cash.

■ ¶ 15 Although not charged in the Complaint, we also find that respondent violated ORPC Rule 8.1(a) by insisting to the OBA that he had no knowledge of the hospital's lien prior to negotiating the first settlement draft. Rule 8.1(a) states, "[A] lawyer ... in connection with a disciplinary matter, shall not ... knowingly make a false statement of material fact...." The fact that the OBA did not specifically charge a violation of this rule is of no consequence:

> "The Bar need only plead sufficient facts that will put the accused attorney on notice of the charges and give him an opportunity to respond to the facts alleged." *State ex rel. Oklahoma Bar Ass'n v. Johnston,* 863 P.2d 1136, 1143 (Okla.1993). RGDP Rule 6.2, which governs the contents of disciplinary complaints, requires only "that the specific facts be set forth, and does not require the lawyer to be notified of the specific disciplinary rule that such conduct violates." *State ex rel. Oklahoma Bar Ass'n v. Moss,* 794 P.2d 403, 407 (Okla. 1990).

*State ex rel. Oklahoma Bar Ass'n v. Perry,* 97 OK 29, ¶ 16, 936 P.2d 897, 900–01. As was the case in *Perry,* "The complaint at issue contained sufficient facts to apprise respondent of the charges leveled against him." *Id.*

¶ 16 In *State ex rel. Oklahoma Bar Ass'n v. Lavelle,* 1995 OK 96, ¶ 28, 904 P.2d 78, 82–83, we stated:

> This Court will not allow an attorney to misuse funds entrusted to [him], especially when that misuse is to the detriment of a

third persons that is in a lawyer's possession in connection with a misrepresentation separate from the lawyer's own property....

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client

or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

client or a third person. We also will not tolerate deception, dishonesty, and fraud to be practiced by a member of this bar whether as a means of gain for the attorney or as a way to conceal the misappropriation of trust funds.

In the present case, respondent was entrusted with settlement proceeds and he misused those funds to the detriment of others. Respondent perpetrated a fraud by obtaining, through dishonesty and/or deception, more than $17,000.00 on a $10,000.00 settlement. Such actions clearly constitute professional misconduct.

¶ 17 The record also contains clear and convincing evidence that respondent violated ORPC Rules 3.1 and 8.4(d) by prosecuting an action against State Bank. Rule 3.1 states, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous...." Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice." Respondent's lawsuit against the bank was frivolous, designed solely to harass and hinder the bank and its attorneys in their collection efforts against him, and constituted conduct prejudicial to the administration of justice. By violating the Rules discussed above, respondent is also guilty of violating Rule 8.4(a), which states that "[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."

## DISCIPLINE

¶ 18 The *principle* purpose of disciplinary proceedings is not punishment of the involved attorney, but preservation of public confidence in the legal profession and in the judiciary that licenses them. *State ex rel. Oklahoma Bar Ass'n v. English*, 853 P.2d 173, 176 (Okla.1993); *State ex rel. Oklahoma Bar Ass'n v. Raskin*, 642 P.2d 262, 267 (Okla.1982). However, "An additional purpose is to deter [the] respondent from committing similar acts in the future and deterring the potential for misconduct by other attorneys." *State ex rel. Oklahoma Bar Ass'n v. Badger*, 1995 OK 113, ¶ 13, 912 P.2d 312, 315. In the present case, respondent's actions surrounding the negotiation of the two settlement drafts demonstrate a deliberate course of dishonest conduct that reflects adversely upon his fitness to practice law. His actions in prosecuting a frivolous lawsuit constituted conduct prejudicial to the administration of justice. Both series of activities have brought discredit to the legal profession.

¶ 19 Respondent presented numerous affidavits from attorneys, judges and laypeople, all of which attested to his good character and reputation in the community. While we consider such evidence in mitigation, we note that none of the affiants professed any knowledge of the facts involved in this disciplinary proceeding.

¶ 20 Upon consideration of the offenses committed herein, we find that the goals of attorney discipline would be best served by imposition of a suspension of two years and one day. *See State ex rel. Oklahoma Bar Ass'n v. Caldwell*, 880 P.2d 349 (Okla.1994) (attorney suspended for two years and one day for intentional misconduct fraught with elements of dishonesty, fraud, deceit and misrepresentation, knowing abuse of legal process, and failure to provide accurate disclosure to disciplinary counsel). Respondent is further ordered to pay the costs of these proceedings in the amount of $4,073.42 within thirty days of the date this opinion becomes final.

RESPONDENT SUSPENDED FOR TWO YEARS AND ONE DAY, AND ORDERED TO PAY COSTS.

KAUGER, C.J., and HODGES, LAVENDER, SIMMS and OPALA, JJ., concur.

SUMMERS, V.C.J., with whom HARGRAVE, J., joins, concur in part, dissent in part:

I concur that discipline is warranted but I do not concur in the court's opinion. I would adopt the report and the discipline recommended by the Professional Responsibility Tribunal.

ALMA WILSON, J., concurs in part, dissents in part:

I would discipline the Respondent by six months suspension.