**STATE of Oklahoma, ex rel., OKLAHOMA BAR ASSOCIATION, Petitioner,**

v.

**H. Richard RASKIN, Respondent.**

**No. SCBD 2969.**

Supreme Court of Oklahoma.

March 17, 1982.

Rehearing Denied March 17, 1982.

Doyle W. Argo, Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for petitioner.

H. Richard Raskin, respondent pro se.

OPALA, Justice:

In this proceeding against a lawyer for imposition of professional discipline the issues are: [1] Was want of a signed or formal complaint with the Oklahoma Bar Association [Bar] a fatal or vitiating flaw in the institution of disciplinary proceedings? [2] Was the recommended sanction of suspension from practice inappropriately lenient? We answer the first question in the negative and the second in the affirmative.

Henry Richard Raskin [Raskin], a licensed lawyer, was charged with two counts of misconduct, both dealing with commingling and misappropriation. The trial authority found Raskin guilty on both counts and recommended that he be suspended from the practice of law. The Bar prosecutor seeks here a more serious sanction, while Raskin urges that disbarment is too severe a penalty. He suggests as more appropriate for this case a private reprimand with suspension from the practice until full restitution has been made.

## COUNT 1

Raskin agreed to perform certain legal services for Mudgett in the "winding up" of his corporate business, known as H & P Associates [H & P]. Raskin was to collect the H & P accounts receivable, pay outstanding corporate taxes owed and work out a pro-rata arrangement with the other creditors. During a three-months period he collected over $20,000 and deposited the money in a trust account. From that account he later withdrew the funds for his own use. He spent the money for his house and car payments and "loaned" some to himself. All this was done without the knowledge of Mudgett or H & P. On several occasions beginning November 1979 Raskin advised another lawyer hired by Mudgett and two IRS agents that he had paid the taxes on behalf of H & P. At the bar hearing Raskin admitted these statements were false because the taxes had not been paid. Mudgett ultimately hired other legal counsel to assist in securing an accounting of H & P's funds which came into Raskin's possession and in ascertaining what dis-

bursements had been made. Raskin made no accounting nor did he pay any of the amount collected. Mudgett suffered financial losses not only from the conversion of these funds but also because of additional legal fees, penalities and interest that had to be expended. As a result of Raskin's derelict behavior the IRS placed a lien on Mudgett's home and property. It remains unreleased.

## COUNT 2

Raskin was retained by Eskridge during the summer of 1979 in a state criminal matter involving conversion of drilling pipe belonging to Ker-Bar Pipe and Supply, Inc. [Ker-Bar]. Ker-Bar also brought against Eskridge a civil action in federal court. Raskin entered into negotiations with Ker-Bar's legal counsel, Shipley, for restitution from Eskridge in an effort to secure a favorable plea bargain recommendation. An agreement was reached. Eskridge was to make an initial lump-sum restitution payment of $10,000 to be placed by Raskin in a trust fund until the entire amount had been deposited. Raskin collected the entire amount in three separate payments and deposited the monies in the trust fund. Of this amount Raskin mailed to Ker-Bar's counsel only $2,000. He explained that he was doing this at Eskridge's request. The statement was false. Eskridge had, in fact, directed him to pay all the money. Eskridge then contacted Shipley to help him persuade Raskin to pay over the remaining funds. Shipley procured garnishment process in the federal civil action and secured an order directing Raskin to turn over the $10,000 to Ker-Bar. Raskin did not pay the amount until five days before the date set for a contempt hearing on Raskin's failure to comply with the court's order. Raskin had admittedly appropriated the trust account funds for his own personal use. He had no authority or permission to do so.

## I.

## THE DISCIPLINARY PROCEEDINGS WERE PROPERLY INSTITUTED

Raskin contends that defects in the investigative process operate as a jurisdictional

barrier because (a) Count 1 did not rest on a signed complaint and (b) the person whose signature appeared on the Count 2 complaint did not remember signing it.

The basis of Raskin's argument as to Count 1 is the method by which the grievance reached the Bar. Mudgett sent a signed letter. Raskin later prepared another letter for Mudgett's signature. That letter stated that the matters were being resolved satisfactorily. Mudgett signed this letter after Raskin had assured him that the taxes had been paid. When Mudgett learned that nothing had in fact been done, he sent another letter of complaint. Mudgett's name on the third letter was typed on the bottom of the text. His signature did not appear on it.

Raskin argues that the complaint in Count 2 is fraught with a fatal infirmity because Eskridge testified that, although his signature appeared on the letter of complaint to the grievance committee of the Tulsa Bar, he did not intend to file such a complaint against Raskin. Eskridge thought Shipley, counsel for Ker-Bar, was going to file the complaint. Although Shipley did not file a formal complaint, he did inform the Tulsa grievance committee about Raskin's misconduct. This information was then forwarded to the State Bar's Professional Responsibility Commission.

The Bar contends that Raskin waived any jurisdictional defects when he stipulated at the pre-trial hearing to the jurisdiction of the trial authority. The stipulation was noted in the pre-trial order and again in the trial authority's report. The Bar further contends that even without the stipulation the procedure followed did not offend the Bar rules. The second letter of complaint embraced in Count 1 could be and was treated as a request to reopen the original grievance. This was done because Raskin had fraudulently induced Mudgett to send the letter withdrawing the initial complaint.

The Bar argues that disciplinary rules permit a two-prong approach to initiation and investigation of bar complaints. The first method provides for the filing of a formal complaint to be referred to the General Counsel of the Bar for investigation. The second provides for the referral of information about one's alleged professional misconduct to the General Counsel when information to that effect, either formally or informally, reaches the Board of Governors, Professional Responsibility Commission, Executive Director or any other officer of the Bar.

██ We hold there was no vitiating flaw in the institution of formal proceedings against Raskin. The errors he urges relate only to the manner in which the bar complaint was called to the attention of the General Counsel. The Bar's Professional Responsibility Commission had received information about Raskin's professional misconduct in both instances and forwarded it to the General Counsel for investigation. This procedure is clearly within the ambit of the rules. The Bar's responsibility to investigate a charge as serious as commingling or misappropriation does not depend on the receipt of an injured client's plea for imposition of discipline. The shield of protection would indeed rest on a frail basis if the Bar's power to proceed against a dishonest lawyer were to depend on the injured party's complaint. Even if a slight departure from the rules was present here, it did not rise to a jurisdictional barrier.

## II.

## VIOLATIONS OF CANONS OF PROFESSIONAL RESPONSIBILITY

██ We do not function in this proceeding as a reviewing tribunal but rather as a licensing court acting in the exercise of its *exclusive original* jurisdiction.[1] Neither the findings of the trial authority nor its assessments with respect to the weight of the evidence and the credibility of witnesses can bind this court. Any other approach would doubtless expose a fundamental infirmity in our bar disciplinary process. It might make that process vulnerable to an

1. *In re Integration of State Bar of Oklahoma,* 185 Okl. 505, 95 P.2d 113 [1939].

attack on the grounds that it is tainted by an impermissible abdication of this court's constitutionally-invested, nondelegable responsibility to regulate both the practice and the practitioners of law.[2] Simply stated, the ultimate responsibility to impose discipline in a case before us is ours alone.

■ As the findings of fact made by the trial authority are not binding here, this court must pass on the sufficiency and weight of the evidence.[3] The burden is cast on the party seeking our re-examination to show that the findings should not be accepted. The evidence in this case is, for the most part, undisputed. There is ample credible proof in the record to support the material findings of the trial authority on the issue of respondent's misconduct. It is plain to us that Raskin violated Canons 1, 6 and 9 of the Code of Professional Responsibility.[4] Those canons and the relevant disciplinary rules provide:

Canon 1. *"A Lawyer Should Assist in Maintaining the Integrity and Competence of the Legal Profession"*

DR 1–102(A)(4), (5) and (6):

"(A) A lawyer shall not: * * * (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (5) Engage in conduct that is prejudicial to the administration of justice. (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

Canon 6. *"A Lawyer Should Represent a Client Competently"*

DR 6–101(A)(3):

"(A) A lawyer shall not: * * * (3) Neglect a legal matter entrusted to him."

Canon 9. *"A Lawyer Should Avoid Even the Appearance of Professional Impropriety"*

DR 9–102(B)(1), (3) and (4):

"(B) A lawyer shall: (1) Promptly notify a client of the receipt of his funds, securities, or other properties. * * * (3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them. (4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

Raskin is also guilty of violating Article IX § 6, Rules Creating and Controlling the Oklahoma Bar Association.[5] That rule provides:

"All members of the Bar shall maintain a Trust Account as required by the Code of Professional Responsibility, Disciplinary Rule 9–102(a), for the deposit of client's funds entrusted to said attorney. * * * Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his clients coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. * * "

*Practice of Deceit and Neglect of Clients' Legal Affairs*

■■ Raskin was charged with neglect of his clients' legal affairs and with practicing deceit upon them. Willful failure to

---

**2.** *Tweedy v. Oklahoma Bar Ass'n.*, Okl., 624 P.2d 1049, 1052 [1981].

**3.** Art. 10 § 16(b), Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S. 1971, Ch. 1, App. 1; *State ex rel. Oklahoma Bar Ass'n. v. Hensley*, Okl., 560 P.2d 567, 568 [1977]; *State ex rel. Oklahoma Bar Ass'n. v. Foster*, Okl., 454 P.2d 654, 656 [1969]; *State ex rel. Oklahoma Bar Ass'n. v. Brandon*, Okl., 450 P.2d 824, 827 [1969].

**4.** 5 O.S. 1971, Ch. 1, App. 3. This proceeding is governed by the disciplinary rules in effect at the time the violations occurred. See Rules Governing Disciplinary Proceedings, 5 O.S. 1981, Ch. 1, App. 1–A for the new rules which became effective July 1, 1981.

**5.** 5 O.S. 1971, Ch. 1, App. 1, now Rule 1.4, Rules Governing Disciplinary Proceedings, 5 O.S. 1981, Ch. 1, App. 1–A.

perform legal services for which a lawyer has been retained in itself warrants disciplinary action. It constitutes a breach of good faith and of fiduciary duty. Even if Raskin's pattern of nonperformance was the result of negligence rather than willful behavior, his deceit of his clients—willful misrepresentation of performance when none was in fact completed—is reprehensible. A member of the State Bar is guilty of gross misconduct when he deceives a client to his injury.

### Commingling and Conversion of Clients' Funds

In their daily work lawyers commonly come into clients' funds. The trust placed in the lawyer owes its origin to the special professional status he occupies as a licensed practitioner. Public confidence in the practitioner is essential to the proper functioning of the profession. Few breaches of ethics are as serious as the act of commingling a client's funds and the unwarranted use of his money.[6]

### III.

### DISCIPLINE

Our task in cases such as this is to protect the public and to preserve the public confidence in the legal profession and in the judiciary that licenses them. The relationship between a lawyer and a client calls for the highest degree of integrity and fidelity. Nothing less can be tolerated.

Lawyers stand licensed by the Supreme Court for the practice of their profession. The maintenance of strict integrity among the members of our bar is one of this court's constitutional responsibilities. Every licensed lawyer is presented to the public as a person worthy of confidence in the performance of all professional activ-

ities. If he should become unfit, it is our duty promptly to withdraw the endorsement for the immediate protection of the public.

### Mitigating Circumstances

The purpose of a disciplinary proceeding is not to punish a practitioner but to inquire into his continued fitness with a view to safeguarding the interest of the public, the courts and the legal profession. Mitigating circumstances may be considered in arriving at what is the appropriate measure of discipline.

Raskin suggests that disbarment is inappropriate because of his otherwise unblemished legal career, the presence of great financial stress and his willingness to make restitution. We differ.

Judicial consideration of restitution as a mitigating factor in disciplinary proceedings is apt to create the impression that sanctions are proportioned in accordance with one's ability to pay, rather than gauged against the seriousness of one's misconduct. According significance to restitution leads to an obvious and substantial possibility of unjust discrimination.[7] The mere circumstance of restitution is likely to be fortuitous and to depend upon conditions and circumstances that afford no reliable test of a person's moral fitness as a lawyer.[8] Restitution may compensate an individual complainant for the financial loss suffered; conceivably, it may partially restore the shattered faith of a particular client. It does not significantly retard the subtle, but progressive, erosion of public confidence in the integrity of the bench and bar.[9] Encouraging restitution in individual cases is a worthy purpose, but the application of lenient discipline needed to achieve it con-

---

6. *State ex rel., Oklahoma Bar Ass'n. v. Smith*, Okl., 615 P.2d 1014, 1017 [1980]; *Matter of Wilson*, 81 N.J. 451, 409 A.2d 1153, 1156–1157 [1979].

7. *Matter of Wilson*, supra note 6 at 1157.

8. "A thoroughly bad man may make restitution, if he is able, in order to rehabilitate himself and regain his position in the community; and a thoroughly good man may be unable to make any restitution at all." *In re Hawkins*, 87 A. 243, 247 [Del.Super.Ct.1913].

9. *Matter of Wilson*, supra note 6.

flicts with the paramount goal of preserving public confidence in the entire bar.[10]

■■ The fact of one's prior outstanding record as a lawyer, seems less important to us where misappropriation is involved. This offense against common honesty should be clear, even to the youngest; and to distinguished practitioners, its grievousness should be even clearer.[11]

■■ A lawyer, beset by financial problems, may steal to save his family, his children, his wife or his home. The sympathy engendered by the plight of the lawyer which caused him to steal is offset by the fact that he did so, most often, without regard for the possibility that he might be inflicting the same misery, or worse, on his innocent client. In commingling cases, a lesser discipline than disbarment has a weakened deterrent effect with the consequent potential for inflicting misery on other clients for whom there will be no likelihood of restitution.[12]

### Measure of Discipline

■■ Maintenance of public confidence in this court and in the bar as a whole requires the imposition of severe discipline in misappropriation cases. We reject hence the recommendation of the trial authority. The extreme sanction of disbarment must be imposed here. A lawyer's license is a certificate of professional fitness to deal with the public as a practitioner of law. That fitness stands terminated after a single act of dishonest dealing with the client's funds. Any other approach would rightly confuse or equate a lawyer's state franchise with a license to cheat the public.

Public confidence is so important that mitigating factors will rarely override the requirement of disbarment. No extenuating factors are present here. We cannot mitigate Raskin's acts of misappropriation, deception and misrepresentation. Whatever the reason for his misconduct, our concern is and must be for the protection of the public, the preservation of its confidence in the legal profession and for the maintenance of the highest professional standards for lawyers. Our own integrity as the lawyers' licensing authority is also at stake here.

We order that Raskin be disbarred and his name stricken from the roll of attorneys. The cost of the transcript and of the proceedings shall be borne by Raskin. They are to be paid immediately after this opinion becomes final.

IRWIN, C. J., BARNES, V.C.J., and HODGES, LAVENDER and HARGRAVE, JJ., concur.

SIMMS, J., not participating.

---

**10.** By withholding discipline when restitution is made, the ethical standards of the profession are not maintained and the confidence of the public is diminished. The offending attorney may misappropriate the funds of other clients, perhaps without further detection. The minimal risks involved in unsuccessful attempts at conversion fail to provide an effective deterrent to attorney defalcations. ABA Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement (final draft June 1970) at

**98.** To the extent that attorney misconduct is treated as a private dispute between the lawyer and his clients, the efforts of the legal profession to preserve its integrity and to protect the general public may be substantially undercut. Attorney Misappropriation of Clients' Funds: A Study in Professional Responsibility, 10 Journal of Law Reform 415, 421 [Spring 1977].

**11.** *Matter of Wilson*, supra note 6.

**12.** *Matter of Wilson*, supra note 6.