2000 OK 57

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Robert H. JAQUES II, Respondent.**

**SCBD No. 4152.**

Supreme Court of Oklahoma.

July 18, 2000.

Dan Murdoch, General Counsel of the Oklahoma Bar Association, Oklahoma City, Oklahoma, for the complainant.

Gary A. Rife, Perry, Rife, Walters & Sullivan, Oklahoma City, Oklahoma, for the respondent.

## PER CURIAM.

¶ 1 Oklahoma Bar Association [OBA or complainant] initiated disciplinary proceedings against Robert H. Jaques II [respondent] pursuant to Rule 6, Rules Governing Disciplinary Proceedings [RGDP], *5 O.S. 1991, Ch. 1, App. 1–A.* In its five-count complaint OBA alleges that respondent violated Rules 5.3,[1] 4.1,[2] 1.15[3] and 1.3,[4] Oklahoma Rules of Professional Conduct [ORPC], *5 O.S.1991, Ch. 5, App. 3–A,* and Rule 1.4,[5]

---

1. Rule 5.3, ORPC, provides:

 With respect to a nonlawyer employed or retained by or associated with a lawyer:
 (a) a partner in the law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
 (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
 (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
 (1) the lawyers orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
 (2) the lawyer is a partner in the law firm in the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

2. Rule 4.1, ORPC, provides:

 In the course of representing a client a lawyer shall not knowingly:
 (a) make a false statement of material fact or law to a third person; or
 (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a

client, unless disclosure is prohibited by Rule 1.6.

3. Rule 1.15, ORPC, provides in pertinent part:

 (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

 . . . .

 (c) When in the course of representation a lawyer is in possession property in which both lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

4. Rule 1.3, ORPC, provides:

 A lawyer shall act with reasonable diligence and promptness in representing a client.

5. Rule 1.4, RGDP, provides in pertinent part:

 (b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the

RGDP. The parties submitted joint stipulations of fact, conclusions of law and an agreed recommendation for discipline to the Professional Responsibility Tribunal [PRT]. In his responses to the original complaint and its amendments respondent acknowledged violations of Rules 5.3, 4.1 and 1.3, ORPC. At the conclusion of an August 31, 1999 hearing the PRT found the respondent had engaged in unethical conduct and recommended a private reprimand.

 ¶ 2 In bar disciplinary proceedings, the Court exercises exclusive original jurisdiction as a licensing court.[6] Even though the PRT has earlier considered a complaint and made recommendations, the ultimate responsibility for deciding whether a violation has occurred and what discipline is appropriate rests with this Court.[7] In reaching its decision the Court undertakes a de novo review of the record—i.e., a review which involves a full-scale evaluation of all relevant facts.[8]

## COUNT I

██ ¶ 3 Respondent organized The Referral Foundation—a law service provider which handled driving violations for truck drivers nationwide. Jaques' brother [John]—an employee of The Referral Foundation—functioned as his law clerk and was given responsibility for ministerial duties in the office. Upon being referred a traffic ticket issued to a truck driver in Nevada, John contacted the Nevada Eastline Justice Court. The Nevada court declined to resolve the matter with him because he was not a lawyer.

¶ 4 John next secured Nevada counsel [Mr. Bell] to represent the truck driver in an attempt to get the ticket reduced to a non-moving violation. He advised the driver that Mr. Bell would represent him in the matter. It then developed that Mr. Bell did not make the scheduled court appearance on the trucker's behalf and the driver was convicted of a traffic violation. Upon learning of the conviction the State of Illinois—the truck driver's licensing authority—contacted the driver's employer about the Nevada citation.

¶ 5 The driver, desirous of resolving the situation with his employer, tried to reach Mr. Bell but was unable to do so. He then contacted John to ask for verification of the Nevada disposition of the ticket. After repeated attempts to reach Mr. Bell, John assumed that Mr. Bell had taken care of the matter and took it upon himself—out of a desire to assist the driver—*to fabricate* an Eastline Justice Court document which reflected that the driver's citation had been amended to a non-moving violation.

¶ 6 Upon receipt of this information from John, the driver's employer contacted the Eastline Justice Court to verify the ticket's resolution causing the Nevada court to discover the fabrication. Upon becoming aware of the Referral Foundation's fraudulent acts the Eastline Justice of the Peace notified the Oklahoma Bar Association of the event.

## COUNT II

██ ¶ 7 Jaques represented the co-personal representatives [DeSpain and Willis] of the T.C. Klock estate, Case No. P–94–1255, filed in Oklahoma County District Court, Oklahoma County, Oklahoma. The co-personal representatives are sisters and the only heirs of the Klock estate.

¶ 8 A sale of the estate's primary asset, the Klock homestead, was arranged and Lawyers Title Company [LTC] was hired to close the same. Out of a fear that the homestead sale would be lost, both heirs encouraged respondent to expedite closing the sale before a final decree was entered in the probate. With only a few days notice respondent learned from DeSpain's husband that LTC had scheduled the closing on August 11, 1995.

hands of a lawyer and upon which the lawyer has a valid lien for his services.

**6.** *State ex rel. Oklahoma Bar Ass'n v. Gasaway*, 1991 OK 33, 810 P.2d 826, 830.

**7.** *State ex rel. Okla. Bar Ass'n v. Dunlap*, 2000 OK 8 ¶ 20, 995 P.2d 1148, 1152; *State ex rel. Okla.*

*Bar Ass'n v. McMillian*, 1989 OK 16, 770 P.2d 892, 894.

**8.** *State ex rel. Oklahoma Bar Ass'n v. Doris*, 1999 OK 94 ¶ 3, 991 P.2d 1015, 1017.

¶ 9 LTC notified respondent that it would need certain documents executed by the co-personal representatives as a precondition to closing. Willis—one of the estate's two heirs—was not inclined to travel from California to execute the required closing documents so she authorized her sister to do what was necessary to close the sale, including signing her name to required documents.

¶ 10 Unbeknownst to respondent LTC also contacted Willis and requested of her (1) a written authorization for DeSpain to act on her behalf at closing and (2) an executed deed. Willis forwarded the signed documents to LTC.

¶ 11 Respondent prepared the documents requested by LTC and allowed DeSpain in his presence to sign them not only for herself but also for Willis. He then used the notary seal of a former employee and improperly acknowledged the Willis signature by forging the notary's signature. The fraudulently acknowledged documents were then forwarded to LTC.

¶ 12 Because LTC had recently received documents from California signed by Willis, it knew she did not personally sign the documents proffered by respondent. LTC confronted respondent and accused him of forgery. At first Jaques denied LTC's accusation but quickly reversed his position and admitted responsibility for the improper acknowledgment.

## COUNT III

 ¶ 13 Jaques represented Credit Acceptance Corporation [CAC] in several collection matters. He was to be paid specified rates for his services as well as any court-awarded attorney fees. Respondent primarily brought legal proceedings on CAC's behalf to secure judgments against debtors. The secured judgments included counsel-fee awards.

¶ 14 Whenever the court clerk's office received payments on judgments, it sent Jaques checks for his attorney fees. A dispute arose between CAC and respondent over this procedure because (1) CAC wanted all funds attributable to a judgment paid directly to itself and (2) it wanted to personally reim-burse respondent for his attorney fees. While CAC and Jaques attempted to resolve their differences, respondent retained the monies he had received in his trust account.

¶ 15 Jaques informed CAC through correspondence that he was going to withdraw his attorney fees from the trust account. When several months had passed and no response to his letter was received, respondent withdrew his fees from the trust account.

¶ 16 CAC ultimately sued Jaques and secured a default judgment against him. Later CAC and Jaques settled their differences and exchanged mutual releases. It apparently was never CAC's position that it did not owe attorney fees to Jaques. The essence of their dispute was how the monies were to be paid.

## COUNT IV

 ¶ 17 Jaques [through the Oklahoma Indigent Defense System (OIDS) ] undertook to represent Robin Harris in an appeal from her conviction for capital murder. Respondent did not file an appellate brief (as he represented he would) or take any other action in the case. Harris' appeal was dismissed by the Oklahoma Court of Criminal Appeals [OCCA] because the "Notice of Intent to Appeal and Designation of Record" was not timely filed.

 ¶ 18 Rule 2.1(B), Rules of the Court of Criminal Appeals, 22 O.S.Supp.1994, Ch. 18, impose upon *trial counsel*—not appellate counsel—the obligation to file the required notice in both the trial court and OCCA. Failure to timely file the required notice results in the appeal's dismissal. Hence, trial counsel's failure to timely file the required notice—and not respondent's failure to file an appellate brief—caused Harris' appeal to be dismissed. Respondent was not derelict in failing to file a brief in Harris' case because the OCCA's clerk never filed the notice which triggers the record's transmittal and hence starts appeal time to run.

¶ 19 On September 5, 1997 OCCA granted Harris an out-of-time appeal and OIDS filed a brief on her behalf. Even though no appellate rights were lost due to the delay, it remains that respondent was obligated to

represent Harris during the appeal's pendency with reasonable diligence and promptness. It is not refuted that after Jaques became Harris' appellate counsel of record on January 24, 1995, he failed to investigate why the notice to transmit the record was not filed.

## COUNT V

¶ 20 OBA claimed that respondent's answer to the original complaint was false. Respondent stated in his response that he had not filed Harris' appellate brief because he had not received the necessary trial transcripts. At the hearing before the PRT complainant recommended that this count be dismissed. The Bar argued that resolution of Count IV also resolved this issue.

## MITIGATING FACTORS

¶ 21 Respondent freely admits his unethical conduct, is contrite about his misguided actions, and accepts responsibility for the same. He cooperated fully in the investigation of Bar's complaint and has not been previously disciplined. His misconduct was not motivated by desire for personal gain but rather was the product of poor judgment and faulty time-management. Further, his clients did not experience appreciable harm as the result of his misconduct.

¶ 22 As to Count I respondent neither assisted John in the unauthorized practice of law nor did he know of, condone or ratify his law clerk's actions. Nonetheless, he accepts full responsibility for his failure to supervise John to the extent necessary to have prevented John's improper acts. As to Count II there is no evidence that respondent was motivated by self interest and neither Willis or DeSpain (respondent's clients) complained of his conduct.

¶ 23 The proffered character evidence was favorable to the respondent.

## IMPOSITION OF DISCIPLINE

■ ¶ 24 Respondent's failure to meaningfully supervise his law clerk is violative of Rule 5.3, ORPC. Improperly acknowledging his client's signature and then offering the false document to Lawyers Title Company is violative of Rule 4.1(a), ORPC. Lastly, it was not diligent representation of Harris for respondent not to have inquired why he was not timely sent the record necessary to prepare his client's appeal. This conduct violates Rule 1.3, ORPC. Each of the above violations of professional ethics demands discipline.[9]

■ ¶ 25 In our assessment of the measure of discipline appropriate to the respondent's unethical conduct we conclude that the PRT and complainant's recommendation of a private reprimand is inadequate under the circumstances. We agree with the PRT's conclusion as to the Count III charges that the respondent had not engaged in unethical conduct. We also accept the Bar's recommendation that Count V be dismissed. While the discipline merited by Jaques' conduct described in Counts I and IV might have counseled for a private reprimand, Jaques' intentional forging of a notary public's signature—as established in Count II's proof—is too serious a deviation from the standards of ethical conduct required of a member of the Bar to warrant a private reprimand.

■ ¶ 26 Of primal importance in imposing professional discipline is the public's protection.[10] The Court accomplishes this goal by its inquiry into a respondent's continued fitness to practice law.[11] *Intentional* deviation from the prescribed standards of ethical conduct gives greater cause for concern than mere negligence. Jaques' forging of a notary public's signature—even though *not* motivated by a desire for personal gain nor causing harm to his clients—is a severe

---

9. Because respondent has stipulated to his violation of Rules 5.3, 4.1 and 1.3, ORPC, the matter now before the Court is uncontested. Hence, it is not necessary that the charges be proved by clear and convincing evidence. *See* Rule 6.12(c), RGDP.

10. *Doris, supra* note at ¶ 36; *State ex rel. Okla. Bar Ass'n v. Raskin,* 1982 OK 39, 642 P.2d 262, 267.

11. *State ex rel. Okla. Bar Ass'n v. Arthur,* 1999 OK 97 ¶ 13, 991 P.2d 1026, 1031.

offense and hence warrants a license suspension of thirty days.

¶ 27 Complainant has applied to have the proceedings' costs of $2,247.84 assessed against the respondent. We grant the application. Respondent shall pay this disciplinary proceeding's cost in the amount of $2,247.84 within ninety (90) days of the date the Court's opinion becomes final.[12]

¶ 28 Accordingly,

**RESPONDENT'S LICENSE TO PRACTICE LAW IS ORDERED SUSPENDED FOR A PERIOD OF THIRTY DAYS AND HE IS ORDERED TO PAY COSTS AS DIRECTED.**

¶ 29 LAVENDER, KAUGER, WATT, BOUDREAU, and WINCHESTER, JJ., concur.

¶ 30 OPALA, J., concurs in part; dissents in part.

¶ 31 SUMMERS, C.J., HARGRAVE, V.C.J., and HODGES, J., disqualified.

OPALA, J., concurs in part; dissents in part:

¶ 1 I concur in imposing discipline; dissent from the lenient sanction.