2013 OK 96

In the Matter of the **REINSTATEMENT OF James E. GOLDEN, Jr. to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.**

No. SCBD–5990.

Supreme Court of Oklahoma.

Nov. 19, 2013.

**378**

## PETITION FOR REINSTATEMENT IS DENIED; APPLICANT IS ORDERED TO PAY COSTS.

Thomas C. Riesen, Crabb, Ferguson & Riesen, Oklahoma City, Oklahoma, for applicant.

Loraine Dillinder Farabow, First Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for respondent.

WATT, J.

¶1 We imposed the most severe of disciplines on the applicant effective December 3, 2007, disbarring[1] Golden and removing his name from the Roll of Attorneys. These sanctions arose from Golden's having pled guilty to the federal felony charge of misprision.[2] His actions resulted in significant economic harm to many individuals and to the health care system as a whole, embarrassment to the legal profession and to this Court, and an undermining of public confidence in the Bar Association and its members.[3]

¶2 Upon *de novo* review,[4] we determine that the applicant did not present clear and convincing evidence[5] necessary for his readmittance to the practice of law in Oklahoma and that he should be responsible for costs of the proceeding in the amount of $2,129.26.[6]

---

1. *State ex rel. Oklahoma Bar Ass'n v. Patmon,* 1998 OK 91, ¶21, 975 P.2d 860, *cert. denied,* 526 U.S. 1120, 119 S.Ct. 1772, 143 L.Ed.2d 801 (1999), *rehearing denied,* 527 U.S. 1058, 120 S.Ct. 25, 144 L.Ed.2d 828 (1999); *State ex rel. Oklahoma Bar Ass'n v. Lavelle,* 1995 OK 96, ¶25, 904 P.2d 78. Although the opinion imposing discipline in *State ex rel. Oklahoma Bar Ass'n v. Golden,* see note 3, infra, was decided on April 22, 2009, the effective date of disbarment was from the date of the Court's order of immediate interim suspension, December 3, 2007.

2. Title 18 U.S.C.A. § 4 (1994) providing:
   "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned for not more than three years, or both."
   This Court had referred to the crime of misprision of felony as arising from the duty of all individuals to prevent felonies when aware of their commission. *See, Hulls v. Williams,* 1934 OK 74, ¶11, 167 Okla. 346, 29 P.2d 582 [Quoting from *Suell v. Derricott,* 161 Ala. 259, 49 So. 895 (1909).]

3. *State ex rel. Oklahoma Bar Ass'n v. Golden,* 2008 OK 39, 201 P.3d 862.

4. *In re Reinstatement of Otis,* 2007 OK 82, ¶7, 175 P.3d 357; *In re Reinstatement of Massey,* 2006 OK 21, ¶12, 136 P.3d 610; *Matter of Reinstatement of Blevins,* 2002 OK 78, ¶3, 59 P.3d 510.

5. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 7, infra.

6. Rule 11.1(c), Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1-A providing:
   "The applicant shall pay a fee to cover the expenses of investigating and processing the application as determined by the Professional Responsibility Tribunal. In addition, the applicant shall pay the cost of the original and one copy of the transcript of any hearings held in connection with the application."

Golden most certainly did not demonstrate stronger proof of qualification than one seeking admission for the first time.[7] The evidence concerning the current state of the applicant's good moral character did not rise to the level of clear and convincing and could in no way be considered as establishing stronger evidence than would have been required of one seeking first time admission. Furthermore, multiple other factors militate against reinstatement, including: the fact that at the same time Golden presented himself as among the most ethical in the profession, the applicant engaged in activities he knew to amount to misconduct; a lack of convincing remorse; the failure to make concerted efforts to repay monetary penalties; and the swiftness with which he sought reinstatement following the period of disbarment.

## FACTS RELEVANT TO REINSTATEMENT PROCEEDINGS

¶ 3 The applicant was admitted to the practice of law on May 8, 1981. On April 22, 2008, we disbarred Golden for his active participation in a health care fraud cover-up and a scheme to defraud his client's employees of their pension funds. The applicant pled guilty to the crime of misprision of a felony, receiving a three-year probated sentence, including five months of supervised curfew, and an order to pay restitution in the amount of $5,719.340.22. It is unnecessary to repeat the detailed facts of the proceeding as they appear in *State ex rel. Oklahoma Bar Ass'n v. Golden,* 2008 OK 39, 201 P.3d 862.

¶ 4 Golden's disbarment ran from December 3, 2007, the date of this Court's order of immediate interim suspension. On April 10, 2013, approximately five months after the running of the five-year disability to practice law, Golden filed for reinstatement pursuant to Rule 11, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A. The hearing on reinstatement was held before the trial panel on June 27, 2013. The trial panel issued its report on July 25th determining that Golden had not met his burden of proof for reinstatement, recommending that this Court deny reinstatement and impose costs. On July 29, 2013, the Bar Association filed an application to assess costs in the amount of $2,129.26. The order setting a briefing schedule issued on July 31, 2013. The briefing cycle was completed on September 23, 2013 with the applicant's waiver of the filing of a reply brief.

## JURISDICTION, STANDARD OF REVIEW, AND BURDEN OF PROOF

¶ 5 It is this Court's nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law. The duty is vested solely in this department of government.[8] Our determinations are made *de novo.*[9] Although given great weight,[10] neither the finding of facts of the

7. Rule 11.4, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A providing:

"An applicant for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement proceedings shall be on the applicant. An applicant seeking such reinstatement will be required to present stronger proof of qualifications than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy toward the applicant must be disregarded. If applica-

ble, restitution, or the lack thereof, by the applicant to an injured party will be taken into consideration by the Trial Panel on an application for reinstatement. Further, if applicable, the Trial Panel shall satisfy that the applicant complied with Rule 9.1 of these Rules."

8. Title 5 O.S.2011 § 13; *Matter of Reinstatement of Pacenza,* 2009 OK 9, ¶ 7, 204 P.3d 58; *Tweedy v. Oklahoma Bar Ass'n,* 1981 OK 12, ¶ 4, 624 P.2d 1049.

9. *In re Reinstatement of Otis,* see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. Hulett,* 2008 OK 38, ¶ 4, 183 P.3d 1014; *Matter of Reinstatement of Jones,* 2006 OK 33, ¶ 7, 142 P.3d 380.

10. *In re Reinstatement of Holden,* 2003 OK 28, ¶ 5, 66 P.3d 416; *Matter of Reinstatement of Kamins,* 1988 OK 32, ¶ 18, 752 P.2d 1125.

trial panel nor its view of the evidence or the credibility of witnesses bind this Court. The recommendation is merely advisory.[11] We are bound neither by its findings nor its assessments as to the weight or credibility of the evidence.[12] A thorough and complete exploration of all relevant facts is mandatory in consideration of matters to regulate the practice of law and legal practitioners.[13] Attorneys suspended for disciplinary reasons will not automatically be reinstated on a *prima facie* showing that the attorney has not engaged in improper conduct during the suspension period.[14]

■ ¶ 6 Before an attorney who has been disbarred may be readmitted to the practice of law, it must be established that the applicant's conduct will conform to the high standards required of a member of the Oklahoma Bar. The burden is on the applicant to demonstrate by clear and convincing evidence that the prerequisites for reinstatement are satisfied.[15] The applicant must present stronger proof of qualifications than one seeking first time admission.[16]

■ ¶ 7 Rule 11.5, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A requires the trial panel to make specific findings regarding whether: 1) the applicant possesses the good moral character which would entitle him to be admitted to the Bar Association; 2) the applicant has engaged in the unauthorized practice of law during the

period of suspension; and 3) the applicant possesses the competency and learning in the law required for admission to the practice of law in the State of Oklahoma. In addition, this Court considers the following eight factors in making a reinstatement decision: 1) the applicant's present moral fitness; 2) demonstrated consciousness of the conduct's wrongfulness and the disrepute it has brought upon the legal profession; 3) the extent of rehabilitation; 4) the original misconduct's seriousness; 5) conduct after resignation; 6) time elapsed since the resignation; 7) the applicant's character, maturity, and experience when suspended; and 8) present legal competence.[17] Each reinstatement decision is determined on a case-by-case basis, carefully weighing all factors.[18]

¶ 8 **a. The applicant has not demonstrated the clear and convincing evidence necessary for his readmittance to the practice of law in Oklahoma.**

■ ¶ 9 Golden relies upon testimony elicited from his witnesses for the proposition that he met the standard of clear and convincing evidence related to his: good moral character, the same being higher now than at disbarment; lack of unauthorized practice of law; present competency in the law; and remorse. The trial panel found that the applicant: satisfied the requirements of Rule 11.1(a), Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A;[19] had

11. Rule 6.15, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Besly*, 2006 OK 18, ¶ 2, 136 P.3d 590; *Matter of Reinstatement of Rhoads*, 2005 OK 53, ¶ 2, 116 P.3d 187.

12. *Matter of Reinstatement of Pacenza*, see note 8, supra; *State ex rel. Oklahoma Bar Ass'n v. Raskin*, 1982 OK 39, ¶ 11, 642 P.2d 262.

13. *Matter of Reinstatement of Pacenza*, see note 8; *Tweedy v. Oklahoma Bar Ass'n*, see note 8, supra.

14. *Matter of Reinstatement of Pierce*, 1996 OK 65, ¶ 22, 919 P.2d 422; *Matter of Reinstatement of Cantrell*, 1989 OK 165, ¶ 2, 785 P.2d 312; *Application of Sharpe*, 1972 OK 92, ¶ 7, 499 P.2d 406.

15. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 7, supra; *Matter of Reinstatement of Jones*, see note 9, supra.

16. Rule 11.4, Rules governing Disciplinary Proceedings, see note 7, supra; *In re Reinstatement of Fraley*, 2005 OK 39, ¶ 37, 115 P.3d 842.

17. *In re Reinstatement of Otis*, see note 4, supra; *Matter of Reinstatement of Blevins*, see note 4, supra; *Matter of Reinstatement of Kamins*, see note 10, supra.

18. *In re Reinstatement of Page*, 2004 OK 49, ¶ 3, 94 P.3d 80; *In re Reinstatement of Anderson*, 2002 OK 64, ¶ 4, 51 P.3d 581; *Matter of Reinstatement of Cantrell*, see note 14, supra.

19. Rule 11.1(a), Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A providing:
"The applicant shall file an original and ten copies of a petition for reinstatement with the Clerk of the Supreme Court, and attach thereto (1) an affidavit showing all of the applicant's activities since the termination or suspension

not required client security funds to be expended; had not engaged in the unauthorized practice of law during the disbarment period, and had maintained his competency and learning of the law. Nevertheless, the trial panel noted its most serious concern involved the area of good moral character and rehabilitation stating that "(t)here was no testimony as to any change in Applicant's behavior which would give rise to a feeling of confidence that under the same circumstances Applicant would behave differently." It determined that Golden had not offered proof sufficient to overcome the former adverse judgment of this Court or that would establish, if readmitted, the applicant would conform to the high standards required of a member of the Bar Association. Both the trial panel and the Bar Association recommend that we deny reinstatement and

impose costs of the proceeding. We agree with these recommendations.

¶ 10 **1) Golden presented no clear and convincing evidence demonstrating that he currently maintains the good moral character expected of a practitioner of the law or that the state of his character would exceed that of an applicant seeking first time admission.**

¶ 11 The applicant presented eight witnesses opining that they considered Golden to be a person of good moral character. One based his opinion primarily on the applicant's role as a father [20] while others grounded theirs on the fact that they believed he had the same moral characteristics when he was involved in the scheme resulting in his plea agreement.[21] Several of the witnesses maintained little to no contact with Golden since he was disbarred.[22] Only one witness, who

---

of his right to practice law and the applicant's place or places of residence since that date; and (2) the applicant's affidavit and the affidavits of the court clerks in the several counties in which he has resided, establishing that the applicant has not practiced law in their respective courts since the termination or suspension of his right to practice law. The applicant shall concurrently furnish a copy of said petition and all other documents filed with the Clerk of the Supreme Court to the General Counsel of the Oklahoma Bar Association."

20. Transcript of Reinstatement Hearing held on June 27, 2013, Victor Bird testifying at p. 57:

"... Q. Do you have an opinion on his current moral character?
A. Very good.
Q. And why do you say that?
A. It may be formed more from—it certainly is based upon what I think of Jim as a lawyer and his ability to represent his client, but it's probably also based upon that I—I have a little soft spot for being a father, and I think he's an outstanding father...."

21. Transcript of Reinstatement Hearing held on June 27, 2013, the Honorable Bryan Dixon testifying in pertinent part at p. 11:

"... Q. Do you have an opinion on his current moral character?
A. I would say yes.
Q. And what is that opinion, please?
A. I don't think your moral character changes that much throughout your life...."
Transcript of Reinstatement Hearing held on June 27, 2013, Harry Woods testifying in pertinent part at p. 37:
"... Q. Do you have an opinion on his current moral character?

A. I think he has high moral character. I think he has maintained that...."
Transcript of Reinstatement Hearing held on June 27, 2013, Steven Brinkley testifying in pertinent part:
at p. 47 "... Q. Do you have an opinion on his current moral character?
A. I think he's of great moral character...."
at p. 51 "... Q. Did he have great moral character at the time he committed this crime?
A. I think he did have good moral character...."
Transcript of Reinstatement Hearing held on June 27, 2013, Honorable Richard Woolery testifying at pp. 68–69:
"... Q. You said you believe he is of current good moral character. Is that right?
A. I've always thought he was, yes?
Q. And that you always thought he was an honorable man. Would it be fair to say then he was of good moral character at the time that he committed the crime?
A. Well, that's a question that I don't think is fair to expect me to answer. I have always thought that he was of good moral character. I did at the time of this event and I do now...."
Transcript of Reinstatement Hearing held on June 27, 2013, Dwight Smith testifying at p. 74:
"... Q. Do you have an opinion on his current moral character?
A. I do. My opinion is that his current moral character is the same as the opinion was before the conviction.
Q. And that is—
A. That is that it's outstanding.

22. Transcript of Reinstatement Hearing held on June 27, 2013, the Honorable Bryan Dixon testifying in pertinent part at p. 9:

had encountered the applicant from time-to-time during his suspension, indicated that he thought that Golden had "a higher moral commitment to maintaining his integrity in the profession."[23] Golden's characterization of his current moral compass was that he was "more so than ever committed to high standards of ethics."[24]

¶ 12 The Bar Association likens the testimony regarding Golden's moral character to that found wanting in *Matter of Reinstatement of Hird*, 2001 OK 28, 21 P.3d 1043. We agree with the comparison.

■ ¶ 13 Hird sought reinstatement after pleading guilty to one count of bank fraud and one count of money laundering. The pleas resulted from Hird's becoming involved in a fraudulent scheme to make his corporate employer appear to be better capitalized to federal examiners than it actually was. The analysis in *Hird*, supra at ¶ 18, on the issue of establishing good moral character is worthy of being repeated here:

> "Good moral character," as used for bar admission, is synonymous with ethical fitness. As evidence of his current moral character, Hird presented several witnesses that testified to Hird's involvement in his community and church and his trustworthiness. **These are the same characteristics that Hird possessed before his conviction. Hird has failed to show that under pressures and circumstances similar to those which led to his past conduct, he would not act differently. Hird has presented insufficient evidence to** show a change in moral character since his resignation. [Emphasis supplied.]

¶ 14 Under *Hird*, supra, the testimony by individuals, having little to no contact with the applicant during disbarment, that Golden possesses the same characteristics today as those he had during the time he was involved in misconduct leading up to his plea agreement falls far short of establishing the clear and convincing evidence necessary for reinstatement.[25] It most certainly cannot be considered as establishing stronger evidence than would have been required for first time admission.[26]

¶ 15 **2) In addition to Golden's having failed to demonstrate the moral character factor, there are multiple other deficiencies militating against reinstatement: at the same time that he presented himself as among the most ethical in the profession, the applicant engaged in activities he knew to amount to misconduct; a lack of convincing remorse; the failure to make concerted efforts to repay monetary penalties; and the swiftness with which the applicant sought reinstatement following the period of disbarment.**

¶ 16 Perhaps the most concerning factor to this Court is that there is no question that Golden, at the time he engaged in the underlying scheme, was a bright, talented, up-and-coming professional who had to understand that his misconduct made a hypocrisy of the legal profession. Based on their knowledge

---

"... Q.... Now, since Mr. Golden lost his license, have you maintained contact with him or has he maintained contact with you?
A. I've only run into him one time since that happened...."
Transcript of Reinstatement Hearing held on June 27, 2013, Michael Burrage testifying in pertinent part at p. 29:
"... Q. Mr. Burrage, how often have you interacted with Mr. Golden since he was disbarred?
A. Not regularly. I would see him on occasions, talk to him, talk about how he was doing and so forth, but it wasn't real frequent...."
Transcript of Reinstatement Hearing held on June 27, 2013, Harry Woods testifying in pertinent part at p. 36:
"... Q. Since he lost his license, have you maintained contact with him?

A. Maintained some contact, not a substantial amount of contact, but I have maintained some contact...."

23. Transcript of Reinstatement Hearing held on June 27, 2013, Jimmy Goodman testifying at pp. 20–21.

24. Transcript of Reinstatement Hearing held on June 27, 2013, James Golden testifying at pp. 104–05.

25. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 7, supra. *Matter of Reinstatement of Jones*, see note 9, supra.

26. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 7, supra; *In re Reinstatement of Fraley*, 2005 OK 39, ¶ 37, 115 P.3d 842.

of the applicant during the period when the misconduct occurred, without exception, the judges and fellow attorneys testifying on Golden's behalf praised his legal skills, his learning of the law, and the way he presented himself in the courtroom, in negotiations with fellow attorneys, and to the public. Each and every individual thought that the applicant presented himself as an outstanding representative of the profession. At the same time these opinions were being formed, Golden was both participating in an unethical and illegal scheme and in law-related activities which undoubtedly made him hyper-sensitive to the criminal activities he participated in and facilitated.

¶ 17 The fraudulent scheme in which the applicant was involved and helped to facilitate began as early as May of 1999. By his own testimony, Golden admitted that while he was acting dishonestly, he was advising other attorneys about their "possible ethical pitfalls." [27] No doubt, he felt well equipped to do so. After all, in 1986, he chaired the Young Lawyers Division and received the award for Outstanding Young Lawyer. Golden's activities also included service on the: Law Related Education Committee; Bar Center Facilities Committee (2004–2007); **Professional Responsibility Tribunal (1991–1997);** Bench & Bar Committee (1988–1989); **Professional Committee to review Model Code of Judicial Conduct (1991); Chair, Legal Ethics Committee (2005–2007);** Civil Procedure Committee; and Budget Committee (1989–1990). His service to the Bar Association was considered laudable at the time, and in other circumstances might support mitigation. Here, it simply magnifies the fact that Golden's actions amounted to creating a hypocrisy of himself as a lawyer and the legal profession in general.

¶ 18 Although acknowledging the harm he caused the Bar Association, the community, and other individuals through his misconduct when asked about his remorse, Golden seemed most concerned with what his actions had cost him as an individual. He lamented having ruined his marriage and having damaged the relationship he had with his daughter. The applicant cited his resulting depression, feelings of guilt, and the loss of association with fellow attorneys and his reputation as factors related to his remorse.[28] He has also expressed his remorse in similar terms to at least one of the witnesses.[29]

---

27. Transcript of Reinstatement Hearing on June 27, 2013, James Golden testifying at p. 103.

28. Transcript of Hearing on Reinstatement on June 27, 2013, James Golden testifying at pp. 99–101:
"... Q. In terms of acknowledging the wrongfulness of this conduct and remorse, what can you tell this Trial Panel?
A. Remorse is a hard thing to categorize, to explain. And, you know, it's—because it's hard to see or understand someone who's exhibiting remorse, I think. I'm not a very demonstrative person by nature, so it tends not to come across very strongly. But I—I made a grave, grave error that hurt the Bar, Association, that hurt the community, that hurt other people, that ruined my marriage, nearly ruined my relationship with my daughter....
Q. You initially had some pretty severe depression because of this. Correct?
A. Yeah....
Q. Have you continued to live with this remorse on a daily basis for the last—
A. I never wake up a single day of my life that I don't think about it. I never go to bed that I don't think about it. I—you know, it's—I—you know I never was—I never got rich practicing law, but I sure as heck had a stellar reputation and had the respect of a lot of lawyers. Every-

one I knew I think. And I lost all of that and I lost the—and I lost a lot of friendships over this. People didn't want to talk to me anymore, and that hurt. It hurt just to live with the guilt of it all. It's just—and the thought that I killed my reputation just—it was the most important thing in the world to me...."

29. Transcript of Hearing on Reinstatement on June 27, 2013, Honorable Bryan Dixon testifying at p. 16:
"... Q. Is it your testimony that—you said you believe Mr. Golden is remorseful based upon how he looked at the funeral. Had he ever—
A. Oh, yeah.
Q.—expressed remorse?
A. I think when you tell me, 'I've screwed up', and we're talking about what's happened to his life. I mean, this affected Sheila Sewell, his wife. I'm sure it affected Alex. His daughter was in high school when this happened. I mean, that is a tremendous blow to the, what he had done. It's unforgiveable [sic], I'm sorry. And what he did to all those people who had a pension, that's unforegivable [sic].
Q. But has he ever expressed remorse for what he did to those innocent victims?
A. He just told me that he had screwed up, and I took that to mean the whole picture, what he had done in this...."

¶ 19 **Initially, Golden denied that his actions had any adverse effect on pension holders who lost their investments as a result of his actions.**[30] When he was called to testify in this cause, he had not apologized to any of the employees who lost their retirements because of his actions.[31] After testifying, and before the Bar Association presented its complaining witness in the original grievance leading to disbarment, he did approach the witness and apologize.[32]

¶ 20 Making full restitution to a lawyer's victims will neither preclude discipline nor insure reinstatement.[33] Nevertheless, the efforts made by an attorney to make restitution are germane in a reinstatement proceeding.[34] Pursuant to an agreement limiting the charges brought against him, Golden agreed to make restitution of $5,719,340.22. However, in the hearing before the trial panel, he attempted to shift the blame to his lawyer for having agreed to such a large amount saying that his attorney didn't advise him that he would be agreeing to pay such a large sum and that he did not understand that the liability would be joint and severable with his co-defendant/former client.[35]

¶ 21 At the time of the reinstatement proceeding, by his own testimony, Golden had paid back something in excess of $100,000.00.[36] Although originally he was making monthly payments in the amount of $500.00, for the last two years before the hearing that amount had reduced to $100.00. This is so primarily because the applicant remained unemployed during this period, choosing not to look for a job outside the legal profession. His excuse for doing so was that he didn't want to take a menial job

30. Transcript of Hearing on Reinstatement on June 27, 2013, James Golden testifying at pp. 186–188:

"... Q. And Exhibit 19 is your response to her grievance, is it not?
A. Yes.
Q. And what does the very last sentence of your response—the second to the last sentence of your response say on page—I guess it would be 2. It says, 'I do not believe I am responsible for creating the problems that she or anyone else encountered with the pension plan'.
A. Yes....
Q. In fact, that response pretty much blames Mr. Seibert as the person responsible for that conduct, does it not?
A. Yes, it does...."

31. Transcript of Hearing on Reinstatement on June 27, 2013, James Golden testifying at p. 186:

"... Q. Have you ever personally apologized to any of the employees who lost their retirement?
A. You mean go to them in person and apologize? No, I have not.
Q. Or in writing?
A. No, I did not. I made my apologies in open court, and that's—that's a public record...."

32. Transcript of Hearing on Reinstatement on June 27, 2013, Sheryl Buckner testifying at p. 224:

"... Q. Has Mr. Golden, prior to today, ever attempted to contact you and apologize for his behavior?
A. Not prior to today. He said it today, but that was the first time I heard it...."

33. *Matter of Reinstatement of Pacenza*, see note 8, supra; *In re Reinstatement of Otis*, see note 4, supra; *Matter of Reinstatement of Massey*, see note 4, supra.

34. See, *Matter of Reinstatement of Pacenza*, note 8, supra; *Matter of Reinstatement of Bradley*, 1993 OK 107, ¶ 8, 897 P.2d 243.

35. Transcript of Hearing on Reinstatement on June 27, 2013, James Golden testifying on p. 28:

"... Q. Did you receive any of this money?
A.... [B]elieve me, I know nothing about criminal law. I know a little more today than I did, but I really didn't at the time. It was joint and several liability with him for everything, so the amount of the—the government had calculated the amount of damages, and then I was thrown in there with. I didn't know that was coming. My lawyer didn't tell me. But, you know, I understand why it was done. I accept it. It's just—it's $5.7 million I don't have...."
We find it interesting that an attorney proclaiming his competence in the law would profess ignorance of the content or consequences of the plea agreement he entered voluntarily. As early as 1913 in *Scribner v. State*, 1913 OK CR 131, 9 Okla.Crim. 465, 132 P. 933, the Oklahoma Court of Criminal Appeals stated the following:
"... [I]gnorance of the law is no excuse, and that every person is presumed to know the law, are principles as old as the common law itself. They are founded on necessity, supported by reason, and are in harmony with justice. But for the existence of these two principles the enforcement of criminal law would be impossible, and courts would become a farce...."
See also, *Matter of Reinstatement of DeBacker*, 2008 OK 17, ¶ 18, 184 P.3d 506.

36. Transcript of Hearing on Reinstatement on June 27, 2013, James Golden testifying at p. 109.

in case a legal one came along.[37]

¶ 22 Besides the applicant's failure to work since the summer of 2011, there is another troubling issue related to restitution and to what Golden refers to as his "estate planning" which he characterizes as having been done because he was feeling "mortal." Through the establishment of an irrevocable trust in 2001 and in divorce proceedings thereafter, Golden was able to protect the bulk of his assets to ensure that his wife and child could continue to live in the family home and the child would be guaranteed funds for her education. The applicant insists that the establishment of the trust, his foregoing interests in the property settlement and transferring those assets to his child, and his failure to list these items on his financial disclosures to the government had nothing to do with any effort to hide assets or his fear of being criminally charged for his misdeeds. However, when questioned by a trial panel member, Golden admitted that he realized he had crossed the ethical line as early as 1998, some three years before creation of his trust.[38]

¶ 23 Golden's testimony concerning his reason for setting up the trust simply will not pass the "smell test." It reeks of the appearance of impropriety. **Clearly, the applicant successfully took steps to protect assets for his family at the same time that he was involved in a scheme which caused others to lose their retirement funds, leaving them and their loved ones without the** protections Golden ensured for his own wife and child.

¶ 24 Golden was disbarred effective December 3, 2007. He filed for reinstatement on April 10, 2013, some five years and less than five months later. Considering the seriousness of his conduct, the disrepute his actions brought on the profession, the judiciary, and this Court, and the lack of a concerted effort to make significant headway on the agreed restitution while protecting assets for his own family, the filing for reinstatement strikes this Court as premature.

¶ 25 Multiple other factors militate against Golden's reinstatement. At the same time the applicant presented himself as among the most ethical in the profession, he engaged in activities he recognized amounted to misconduct. Golden's testimony tends to indicate that he's remorseful primarily because of the consequences to himself and his family but it demonstrates a lack of convincing remorse for the victims of his misconduct. The applicant has failed to make concerted efforts to repay monetary penalties and he was quick to seek reinstatement on the heels of the end of the period of disbarment.

## CONCLUSION

¶ 26 We agree with the trial panel that the applicant has not engaged in the practice of law during the period of disbarment and that he appears to have kept abreast of the law. This Court also agrees that the most serious area of concern with Golden is the state of his current moral character. Other concerns also exist, including: the fact that at the

37. Transcript of Hearing on Reinstatement on June 27, 2013, James Golden testifying at p. 172:

"... Q. Wouldn't it be better to be working at a job making $8 an hour as opposed to making zero an hour and making very little payment toward restitution?
A. If I made $8 an hour, I definitely couldn't pay any more.
Q. So you're not willing to even try that to try to make these people whole?
A. I'm not going—no, that's not true. That's not my point.
Q. Your point is that if you were employed working 40 hours a week at minimum wage, if a legal-related job came along, you wouldn't be able to accept it?
A. That's exactly right.
Q. You couldn't quit the minimum-wage-paying job to take on the legal job?
A. I could. And that would be pretty—that wouldn't be fair to an employer...."

38. Transcript on Reinstatement Hearing on June 27, 2003, James Golden testifying on pp. 206–07:

"... By Mr. Crawford:
... Q. Can you pinpoint a date, just a ballpark date—
A. Yes, sir.
Q.—of when you think you crossed the line, when you realized, 'I crossed the line'.
A. That's a great question, but I would—I would say from the moment I began documenting anything for that Healthcare International, and that would have been 2008. And I didn't—I mean, I—
Q. Is it 2008 or—
A. I mean '98. I'm sorry. The—that would have been that date...."

same time Golden presented himself as among the most ethical in the profession, the applicant engaged in activities he knew to amount to misconduct; a lack of convincing remorse; the failure to make concerted efforts to repay monetary penalties; and the swiftness with which he sought reinstatement following the period of disbarment.

¶ 27 Our pronouncement today should not be conceived as a determination that the applicant may never be allowed to again practice law in Oklahoma.[39]  Nevertheless, in making a reinstatement decision, this Court must disregard feelings of sympathy,[40] recognizing that the applicant's burden of proof is a heavy one.[41]  While we are concerned with any adverse effect reinstatement might have on the practicing bar, our foremost consideration is always to protect the public welfare.[42] After having given due consideration to the evidence contained in this record and the appropriate factors examined in reinstatement proceedings, we determine that the applicant has failed to carry his burden to show by clear and convincing evidence [43] that he is entitled to reinstatement.  Therefore, reinstatement is denied and costs of $2,129.26 [44] are imposed.

**PETITION FOR REINSTATEMENT IS DENIED; APPLICANT IS ORDERED TO PAY COSTS.**

COLBERT, C.J., WATT, WINCHESTER, TAYLOR, COMBS, JJ., Concur.

KAUGER, EDMONDSON, GURICH, JJ., Recused.

REIF, V.C.J., Disqualified.

---

39. Reinstatement may be denied based on the seriousness of the offense and the disrepute a lawyer's conduct has cast on the legal profession. *Matter of Reinstatement of Hird*, 2008 OK 25, ¶ 7, 184 P.3d 535; *Matter of Reinstatement of Page*, see note 18, supra; *Matter of Reinstatement of Smith*, 1994 OK 19, ¶ 12, 871 P.2d 426.

40. *Matter of Reinstatement of Pacenza*, see note 8, supra; *Matter of Reinstatement of Page*, see note 18, supra.

41. *Matter of Reinstatement of Bradley*, see note 34, supra; *Matter of Reinstatement of Kamins*, see note 10, supra.

42. *In re Reinstatement of Fraley*, see note 26, supra; *Matter of Reinstatement of Cantrell*, see note 14, supra.

43. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 7, supra.

44. Rule 11.1, Rules Governing Disciplinary Proceedings, see note 6, supra.